775 A.2d 127 (2001)
STATE of New Jersey, Plaintiff-Respondent,
v.
Marcelina BALUCH, Defendant-Appellant.
No. A-3687-98T4.
Superior Court of New Jersey, Appellate Division.
Submitted May 16, 2001.
Decided June 13, 2001.
*131 Peter A. Garcia, Acting Public Defender, for appellant (Ruth Bove Carlucci, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for respondent (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
Before Judges WALLACE, JR., CARCHMAN and PARRILLO. *128 *129 *130
*132 The opinion of the court was delivered by CARCHMAN, J.A.D.
Following the death of her children's nanny, Imelda Ritua (Imelda), and the separate jury trial of her husband, Ejaz Baluch (Ejaz), defendant Marcelina Baluch was convicted by a jury of second-degree reckless manslaughter, N.J.S.A. 2C:11-4b(1), third-degree aggravated assault, N.J.S.A. 2C:12-1b(7), and third-and fourth-degree hindering of her own and Ejaz' apprehension, N.J.S.A. 2C:29-3b, -3a. Defendant was sentenced to an aggregate term of five years-nine months' imprisonment. She appeals.
During his trial, Ejaz testified on his own behalf and implicated defendant as Imelda's assailant. During defendant's trial, when called as a witness on behalf of the State, Ejaz sought to invoke his spousal privilege, and after being compelled to testify, recanted his earlier statement and exculpated defendant. He then claimed that a statement he had given to a friend immediately after discovering Imelda's body inculpating defendant was also false. Defendant challenges a number of the trial judge's rulings. While disposing of her various claims, we specifically address the scope and waiver of the spousal privilege, as well as the admissibility, as substantive evidence, of prior inconsistent statements proffered by a party's witness at an earlier plenary trial. As to these two primary issues, as well as the remaining claims asserted by defendant, we conclude that the trial judge did not commit reversible error, and affirm.

I.
The scope of asserted error and the complex history of this case necessitates an expansive, detailed recitation of both the procedural and factual background.

A.
In the morning hours of March 13, 1996, the State Police discovered Imelda's clothed body bound in twine and dark plastic garbage bags on the shoulder of Burlington County Road 542 in the Pinelands. She was easily identified, as her name had been written on the inside of her slacks. Further investigation revealed that she was twenty-eight years old, and that she had emigrated from the Philippines to the United States on October 6, 1994, ostensibly to work under the sponsorship of the Fitzpatrick Hotel in Manhattan, where Ejaz served as comptroller, and under whose auspices Ejaz had filed Imelda's false work-visa application without the hotel's permission.
The Baluchs admitted that they actually brought Imelda directly to the United States to become their housekeeper and live-in nanny to their two young children after defendant resumed employment as a registered nurse in the Intensive Care Unit of Newark Beth Israel Hospital. In addition to her childcare and housekeeping duties, Imelda also gave Ejaz regular evening massages for "tips." Imelda's employment with the Baluchs was arranged with the aid of defendant's sister from the Philippines, Lolita Sagadraca, who, according to Ejaz, filed false documents concerning Imelda's work credentials in that country at his behest.
Imelda's seventeen-month stay with the Baluchs was an unpleasant one, as both Ejaz and defendant admitted that they verbally abused and "slapped" her occasionally for various housekeeping and childcare errors. Imelda's stay apparently became decidedly less comfortable when Lolita arrived as a tourist five months later and remained on a fraudulently obtained work visa. Lolita displaced Imelda from her bedroom to a sofa-bed in the *133 basement, and commuted with Ejaz to Manhattan daily, where she worked in the Fitzpatrick Hotel as a chambermaid. According to the Baluchs, Lolita was "very critical" of Imelda, "tende[d] to slap her right and left" herself, and encouraged the Baluchs to be less kind to her because she was only "a maid." By early 1996, the Baluchs had decided to send Imelda back to the Philippines and to import her replacement, again on false papers to be submitted by Ejaz and Lolita.
On her last regular day off, Sunday March 10, 1996, Imelda went to New York to visit friends and St. Patrick's Cathedral. She returned to the Baluchs' home that evening at approximately 6:00 to 7:00 p.m., tired, but un-bruised and seemingly healthy. After she ate dinner with the family, Ejaz asked her for a massage, and defendant and Lolita then both went to bed.
On Monday, March 11, Lolita and Ejaz left for work together at approximately 8:15 a.m., and did not return home until approximately 9:00 p.m. Defendant was at home with Imelda for at least part of the day, and claimed to have given Imelda the day off because she was not feeling well.
By 9:30 that evening, Imelda was dead in the basement laundry room. The immediate cause of death was anoxia. She also had five broken ribs, multiple contusions, and fat globules and bronchopneumonia in her lungs. Rather than reporting her death, the Baluchs bound her body in a sheet, garbage bags, twine, and a rug, loaded it into a rented van, and, on March 12, 1996, dumped it by the side of the road in the Pinelands. Ejaz subsequently disposed of the rug and the remainder of Imelda's clothing. The Baluchs then disseminated the fabrication that Imelda had voluntarily left their employ to visit friends or relatives on March 3, when they drove her to the Metuchen train station and placed her on a train for parts unknown.

B.
The Baluchs were arrested after a yearlong State Police investigation, including numerous interviews with defendant, Ejaz, and Lolita, as well as with Ejaz' and defendant's friends and co-workers. They were jointly indicted for purposeful or knowing murder, N.J.S.A. 2C:11-3a(1), (2), second-degree aggravated assault, N.J.S.A. 2C:12-1b(1), third-degree criminal restraint, N.J.S.A. 2C:13-2, and third and fourth-degree hindering apprehension or prosecution of themselves and each other, N.J.S.A. 2C:29-3b, -3a.
Due to "differently admissible" proofs, the Baluchs were tried separately. Ejaz and defendant each proceeded on the theories that pneumonia, an accidental fall down the stairs, or fat emboli resulting from assault-related injuries caused by each other had induced Imelda's death. Each also contended that the other was the dominant marital partner who had promoted disposing of Imelda's body and lying to the police in order to hinder their apprehension.
Ejaz testified on his own behalf at his trial. His defense was based, in part, on the theory that defendant had beaten Imelda on the day of her death, that Imelda had fallen down the stairs in the course of that beating, and that, against his express wishes to notify authorities of Imelda's death, the Baluchs had agreed to dispose of her body because defendant had "cried and begged him not to call the police." At trial, Ejaz described the sequence of events in which he then placed a telephone call to enlist the aid of his friend, Mian Hussain, to dispose of the body. He stated that he called Hussain at approximately 10:15 p.m., while still "in complete shock," and said:

*134 A I told [Hussain] that I just got home and I found that my babysitter is dead and obviously she had died with some natural causes which I don't know, we don't know what they are, but she did have bruise and my wife did beat her up today or she hit her or whatever and during the course when that happened she also fell from stairs, so I said to him I don't know what to do, I asked him if he could tell me. He said to call the police. I told him I call the police they're going to arrest my wife, I can't let police arrest my wife.
Ejaz later acknowledged that his strategy of "shift[ing] the blame" for Imelda's death and disposal to defendant "to gain the sympathy of the jury" was largely successful. He was acquitted of all homicide charges, convicted only of the aggravated assault and hindering charges, and sentenced to a probationary term conditioned upon his payment of Imelda's funeral expenses and 364 days in the county jail. By his own account, he "won."
After his trial, Ejaz' factual contentions changed. He joined in defendant's defense at her subsequent trial asserting that he was the "controller" in the family, that defendant was but a "dutiful, obedient" wife, that he had lied to Hussain about defendant beating Imelda in order to induce his aid, and that he had actually instigated the disposal of Imelda's body himself to hinder the Baluchs' apprehension for making the fraudulent visa applications for Imelda, Lolita, and Imelda's intended replacement.
Defendant moved in limine to exclude: (1) Ejaz' testimony, claiming spousal privilege, N.J.R.E. 501(2)(a); and (2) defendant's co-workers' anticipated prior bad acts testimony, as irrelevant and unduly prejudicial, N.J.R.E. 402, 403(a), 404(b). The judge denied the motions, reasoning:
With regards to the spousal immunity.... [t]he old Rule 23 read, if you look at it, counselors, to the effect that both parties, the spouse and the defendant, had to consent in order for testimony to come in. That's not applicable any more. The rule was changed and the rule now clearly, clearly gives that privilege to the spouse witness.... In this case that would be Ejaz Baluch, the husband. He holds the privilege. He does not want to testify, he does not consent to testify; therefore, if the State is going to be able to call him as a witness I would have to find ... that there has been a waiver of that privilege. Now, we all know, it is quite clear from the law ... that the reason for the privilege, the spousal privilege, is the harmony or the maintenance of harmony in the marriage, in the relationship as husband and wife of the family.
In this particular case Ejaz Baluch in his case took the stand voluntarily, intelligently, without any pressure of any kind and he testified at length. He disclosed all of the information which is now sought to be excluded by the wife from her trial. He has in fact published all the information that would have been privileged, that would have not ever seen the light of day had he not testified and answered the questions of his lawyer. It is quite clear that under ... N.J.R.E. 530, Ejaz Baluch has in fact waived his 501(2) privilege by testifying in his own behalf and by offering or giving the information to the jury in that case and actually to the public at large, it was widely publicized at the time of trial, so that in effect the policy considerations of the State have already been defeated by Mr. Baluch himself by volunteering the information. The information has been disclosed. Any damage that was going to occur, that was going to happen to the marriage, should have *135 already happened. Obviously it has not had an effect and obviously he has in fact waived his spousal privilege; therefore, the motion ... with respect to spousal privilege is denied. I find specifically that Ejaz Baluch has waived that privilege and that he is in fact the holder of the privilege.
With regards to the statements [of] the co-workers, those statements are all admissions. No one argues differently. We have State versus Cofield, State versus Nance and otherState versus Brown, Conway, other cases, and it's quite clear that in order for the evidence to be admissible it has to be relevant to a material issue, it must be similar in kind and reasonably close in time to the offense charged. The evidence of the other crime must be clear and convincing and the probative value of the evidence must not be outweighed by its prejudice.
The State's argument quite clearly is that that evidence comes in under 404(b) in order to establish intent, identification and motive. It is quite clear that the evidence is admissible for those purposes... under 404(b).
I find that all of that evidence would in fact be material and relevant to the issues before this Court and I also find that the probative value ... of that evidence is not substantially outweighed by any prejudicial effect that it might have. The rule is that the evidence will only be excluded if its probative value is substantially outweighed by the risk of undue prejudice. I find that this evidence, its probative value, is not substantially outweighed by the risk of undue prejudice. The Court obviously will have to charge the jury appropriately so that they do not misuse the evidence and draw the inference that ... this defendant would have a propensity to commit an act because of the prior history. Obviously that type of charge ... will be necessary.
The judge subsequently denied Ejaz' motion to quash the State's subpoena on Fifth Amendment privilege grounds, noting that under State v. DeCola, 33 N.J. 335, 164 A.2d 729 (1960), the court's compulsion of his testimony would confer automatic immunity against Ejaz' prosecution for any perjury he may have committed while testifying at his own March trial. Defendant's trial proceeded accordingly, with both parties relying heavily upon the witnesses' prior statements and the transcript of Ejaz' trial to impeach witness credibility at defendant's trial.
The manner of Imelda's death was placed squarely at issue by defendant prior to any substantive medical testimony, as defense counsel explored the qualifications of the State's expert, Burlington County Medical Examiner Dante A. Ragasa, M.D., on voir dire:
Q One of the things a forensic pathologist does is determine a manner of death, correct?
A Yes, sir.
Q And there's five manners of death, correct? There's natural death, accidental death, correct?
A Yes, sir.
Q Homicide, correct?
A Yes, sir.
....
Q And one of the things a forensic pathologist does is determine the manner of death, correct?
A Yes, sir.
Q Okay. Now in determining the manner of death homicide is a medical definition that you use, correct?
A Actually it's a legal term, terminology.
Q Well, what homicide means in determining manner of death, determine *136 that it's a homicide, you mean it was caused by a human agency, correct, another human being? Correct?
A Yes, sir.
Ragasa was deemed qualified to testify as a pathology expert, and set forth his findings and opinion as to the cause and manner of Imelda's death. We reiterate those detailed findings, as the cause of Imelda's death was in significant dispute.
Ragasa described multiple contusions on Imelda's body, including extensive bruises of varying ages, ranging from one day to two weeks old, on her back, buttocks, and the back of her legs. He noted a bruise above Imelda's right breast determined to be less than one week old, an older bruise above her left breast, and bruising estimated to be one to two days old below her right eye and on the right side of her pubis, lower abdomen, and various areas of the front and side portions of both legs. He also noted a dimpled area on Imelda's center forehead at the hairline, bulging in the left parietal temporal area under her hair, lacerations or abrasions on the top of her left ear, nose, and upper lip, as well as dried blood on her toes and left ear, and foot edema, indicating that Imelda had suffered those injuries and heart failure before her death.
His internal examination revealed two right- and three left-rib fractures in the breast areas with recent adjacent soft-tissue hemorrhages indicating that the fractures were likely one day, but perhaps up to one week old. The exam also revealed extensive hemorrhaging in Imelda's scalp indicating multiple blunt-force traumas pre-dating the rib injuries, heart failure and related lung congestion, and scattered areas of inflammation in normal weight lungs indicating early-stage bronchopneumonia pre-dating the rib fractures. Notably, he observed several fat emboli in her lungs caused by her soft tissue injuries or rib fractures. Based on these findings, Ragasa opined that Imelda died of anoxia caused by "fat embolism secondary to the multiple contusions and rib fractures with bronchopneumonia." When asked what that meant, Ragasa replied, "It means it's a case of homicide," and explained that considering her age, Imelda would not have died from the pneumonia alone. Defendant did not object to Ragasa's characterization or conclusion.
On Ragasa's cross examination, in addition to advancing the notion that Imelda's injuries and fatal anoxia had been caused by pneumonia rather than assault-related fat emboli, defendant also attempted to adduce proofs that Imelda's rib fractures and scalp injuries might have resulted if the pneumonia had caused Imelda to fall down a flight of stairs:
Q The decedent could have fallen down the steps because of the pneumonia and sustained a rib fracture and head bruises in the manner that she displayed them on your examination, couldn't she?
....
Q My question is that that's consistent with the decedent falling down steps because of pneumonia, correct?
A It can happen. The decedent can fall down the steps even without the pneumonia.
Q Right. And get those types of injuries, correct?
A Well, it's possible.
Defendant's pathology expert, John E. Adams, M.D., opined that Imelda died of diffuse pneumonia. He further opined that the onset of pneumonia predated Imelda's injuries, and predated her death by at least two days. He agreed that Imelda had sustained bruises on both sides and the back of her scalp, under her right eye, and on her shins and chest before her *137 death, but attributed the remaining discoloration of her body to post-mortem insect activity and lividity, or pooling of the blood due to gravity. He attributed the ear laceration to post-mortem mouse activity. He estimated that Imelda's rib fractures and scalp injuries had occurred at approximately the same time, eighteen to twenty-four hours before death, or on Sunday, March 11, and that her visible bruises were two days old or less. Finally, he opined that because the pneumonia predated her injuries, "one possible scenario" was that "[they] all could have been sustained in one or more falls down the steps."
On cross examination, Adams conceded that as to manner of death, Imelda's contusions and broken ribs "could be the result of repetitive striking by someone else," that it was "entirely possible" that the rib fractures may have contributed to her death by impairing her pneumonia-compromised breathing, and that "if the broken ribs were inflicted by someone else then that would make it ... a homicidal death," "because that's the definition of homicide. It's the death of someone at the hands of someone else." Defense counsel neither objected to the line of questioning nor moved to strike Adams' responses.
Ejaz claimed that he "lied" at his own trial and falsely "shifted the blame" for Imelda's death and hindering the Baluchs' apprehension to defendant in order to "gain the sympathy of the jury" and secure his acquittal on the criminal homicide charges. After being declared a hostile witness, N.J.R.E. 611(c), he admitted that he called his friend Hussain after discovering Imelda's body. He claimed that Hussain hated defendant, and that his statement to Hussain that defendant had beaten Imelda was merely a fabrication calculated to induce Hussain's aid in disposing of the body by evoking his sympathy for Ejaz and the predicament defendant had created:
Q You testified at your trial you were going to call the police, correct?
A That's correct, but I lied.
Q You testified at your trial that your wife cried and begged you not to call the police, correct?
A It was a lie, yes. I had to shift the burden at that time to defend myself.
Q And you didn't do anything to Imelda, did you?
A No, I did not.
....
Q And you called a man by the name of Mian Hussain?
A Correct.
Q And the reason that you called Mian Hussain was to help you dispose of the body?
A Correct.
Q You and your wife decided that time you were going to dispose of the body so the body couldn't be traced back to your family?
A That's not correct.
Q You planned it by yourself? It was your idea?
A That's my idea.
Q And the reason that you wanted to dispose of the body was because your wife beat up Imelda?
A That's not correct.
Q And the reason you wanted to dispose of the body was because you wanted to protect your wife?
A That's not correct.
Q Do you recall telling Mian Hussain that the reason you wanted him to help you dispose of the body is because your wife beat up Imelda?
....

*138 A Yes, I told him because I wanted to earn his sympathy because he hates my wife. If I tell him anything with me he's not going to do anything for me.
Q You told Mian Hussain the reason you wanted him to dispose of the body you were afraid the police were going to arrest your wife?
A That's right.
Q You told Mian Hussain the reason you wanted him to dispose of the body with you you wanted him to protect your wife?
A That is not correct. I did tell him, but that's not correct.
....
THE COURT: The question is did you tell him that.
A Yes, I did tell him.
Q And you did tell him that your wife beat up Imelda, right
A I did tell him.
Q and that's the reason she died? Did you tell that to Mian Hussain?
A I told Mian Hussain she died some natural causes and we have no clue about it. We didn't know at that time she died of pneumonia. That came until after [sic] we found out in discovery when the doctor did the proper work.
Ejaz was then confronted with a transcript of his prior testimony. It was only at this point that defendant, belatedly, objected to these questions. She moved for a mistrial on the ground that "[t]here is no hearsay exception that allows [Ejaz] to testify to anything he said that is incriminating of his wife outside his wife's presence." The judge noted that the statements had not been offered substantively for their truth, and overruled the objection. Counsel's request for an immediate cautionary jury instruction was denied, and Ejaz' prior testimony from his own trial concerning his telephone call to Hussain was read aloud and affirmed by Ejaz.
Ejaz then stated that he and defendant "dump[ed] the body" after he, defendant, and Lolita had all agreed to do so, but he repudiated his prior testimony that he intended to protect defendant. Instead, he claimed that he promoted disposing of Imelda's body against defendant's wishes to protect himself because he had brought Imelda to the United States illegally. Contrary to his own trial testimony that he and defendant had jointly developed the story that Imelda voluntarily left the Baluchs' employ on March 3, Ejaz also claimed that he alone "cooked up that story," and that defendant and Lolita had dutifully followed his instructions to lie to the police in order to maintain the ruse: "My wife lied. Lolita lied. Everybody lied." Despite his further admission that he attempted to suborn the perjury of a co-worker who later learned of the circumstances of Imelda's death from Lolita, and that he advised his co-worker "not to worry" because "perjury is only a small crime," Ejaz steadfastly maintained that he "didn't know" whether he himself would lie to protect defendant.
Ejaz also maintained that although defendant had a "bad" and "short" temper, and yelled at Imelda "[o]nce in a while if she d[id] something stupid," defendant's temper was "[n]ot as bad" as his own. He admitted that he "slapped" Imelda twice and saw defendant slap Imelda on two separate occasions for housekeeping and childcare errors, but insisted that Lolita slapped Imelda more frequently than either of them, "for anything [Imelda did] wrong."
On cross-examination, defense counsel pursued a line of questioning which intimated that Ejaz had a sexual relationship with Imelda, and that Imelda might have thwarted his advances on the evening before *139 her death. Ejaz denied the suggestion.
At the close of Ejaz' testimony, defendant renewed her application for a mistrial or an immediate curative instruction limiting the jury's consideration of the content of Ejaz' telephone call to Hussain for impeachment purposes only. The judge reserved decision, initially indicating that he would probably give such a limiting instruction, but upon further consideration, determined that Ejaz' prior inconsistent statement was also admissible substantively for its truth. Although defense counsel made no immediate objection or comment on the ruling, he renewed defendant's mistrial application four days later. The judge again denied the application:
[DEFENSE COUNSEL]:.... This time I have an application for a mistrial... based upon the admission of the testimony of Ejaz Baluch to Mian Hussain. The Rule 803 regarding prior statements of witnesses being admissible says that such statements are admissible provided it would have been admissible if made by the declarant while testifying. Well, one of the reasons
THE COURT: We're talking about the statement made by Ejaz Baluch to Mian Hussain
[DEFENSE COUNSEL]: That's correct.
THE COURT:and Ejaz Baluch is the gentleman who was the witness here who testified under oath who was subject to cross examination?
[DEFENSE COUNSEL]: That's correct.
....
[DEFENSE COUNSEL]: Judge, 803(c)(25) ... states that the statement has to be contrary to the declarant's interest, not to anybody else's interest.
....
THE COURT: At the time the statement was made [it] was certainly against his penal interest because he was involved in a conspiracy to hinder his own apprehension .... [and] the apprehension of another.
[DEFENSE COUNSEL]: There's no charge of conspiracy.
THE COURT: ... [Y]ou're technically correct, there is no charge of a conspiracy, but at the time he was involved in a course of action to hinder his apprehension... [and that] of his wife ... when he made those statements. The other argument ... is [that] these could have been excited utterances. He had just discovered that the maid was dead... and he makes these phone calls ... almost immediately or within a very short period of time.
[DEFENSE COUNSEL]: Judge, so that the record is clear, it has to be contrary to his interest. Incriminating somebody else is not contrary to the declarant's interest.
THE COURT: How about hindering his apprehension ... isn't that against his penal interest?
....
I'm going to deny your application, counselor.... [F]irst of all, I've already ruled that the statements were admissible. This gentleman ... was here. He was a witness prior. He was subject to cross examination both times. He was under oath both times and I see no reason to declare a mistrial at this particular point.... I do not find any violation of Rule 803 or any other rule for that matter with respect to his testimony.
Lolita noted that defendant had "a high temper and a loud voice," and was "always upset with ... and ... hurting Imelda." She stated that she witnessed defendant strike Imelda many times, including in *140 Ejaz' presence, and that Ejaz made no attempt to intervene. She also observed that Imelda was "not so healthy" in the two days preceding her death, and that Imelda was "sad and ha[d] a lot of scratches." Lolita contended that the Baluchs disposed of Imelda's body while Lolita cared for their children, and agreed that she had previously testified at Ejaz' trial that she witnessed Ejaz hit Imelda perhaps on ten or more occasions, and that he "push[ed] Imelda and ... Imelda got hurt." She claimed that she was not involved in any conversation or planning to dispose of Imelda's body, but also claimed that defendant had suggested they bury the body in the back yard.
Five of defendant's co-workers from the Intensive Care Unit at Newark Beth Israel Hospital testified for the State. The first noted that defendant "had a temper," and that when she was angry, she spoke loudly and banged clipboards and patients' charts. She indicated that defendant frequently spoke of Imelda at work, referring to her as "SLB," for "stupid lazy bum," and that defendant admitted that she slapped Imelda on occasion, that she "hit" Imelda whenever Imelda tried to "answer back" to reprimands, and that she once "banged [Imelda's] head on the wall" when she was angry with her. When defendant returned to work after Imelda's death, she told this co-worker that Imelda left her employ after an argument, and that defendant had delivered her to the train station.
After this direct testimony, the judge immediately gave a cautionary instruction to the jury on defendant's co-workers' prior bad acts testimony, and explained that the testimony concerning defendant's prior physical abuses of Imelda was only to be considered as it related to the motive, intent, or identity of a person who might have caused Imelda's death, and not to be used as propensity evidence against defendant.
Another co-worker then reported that after Imelda's death, defendant announced that she "finally got rid of" Imelda and had taken her to the Metuchen train station. A third corroborated the other co-workers' testimony, and added that she once heard defendant "scream" and "curse" loudly over the nurses' station telephone, declaring "you're going to get it tomorrow when I see you." Defendant had later explained that her youngest child had sustained a head bump while under Imelda's care, and that defendant had instructed Imelda to "bang her head on the wall so she would know how it feels." Defendant reported that Imelda obeyed, and had banged her own head against the wall. This co-worker also stated that defendant did not get along well with some of the other nurses, and that they would occasionally argue with or scream at each other. Two other co-workers corroborated the earlier testimony, and one added that defendant admitted she had pulled Imelda's hair, in addition to slapping her.
Defendant testified on her own behalf. Although Imelda was "slow and forgetful," defendant "like[d]" her, gave her various gifts, and always brought her along on family vacations. She denied ever having fought with Imelda, hitting Imelda's head against a wall or commanding her to do so, hitting her in the ribs, or pushing her down the stairs. She also denied ever having thrown or banged charts at work or having yelled at her fellow nurses. She claimed that one of her co-workers had coined the nickname "SLB" for Imelda after defendant complained about Imelda's performance, and that three of the co-workers who had testified against her were simply not fond of her because of her "filthy rich ... Pakistani Muslim husband."
*141 According to defendant, after Imelda ate dinner with the family at approximately 8:30 p.m. on Sunday March 10, Ejaz asked Imelda for a massage, and defendant went to bed.
Defendant noted that after she fixed breakfast for Ejaz and Lolita the following morning, Imelda entered the kitchen as Ejaz and Lolita were departing for work, and asked defendant for the day off. Imelda had "a bruise on her right eye and a bump [on her head]," and defendant gave her some Tylenol and the day off. Imelda was in the family room watching television both when defendant and her child left the house at approximately 11:00 a.m., and when they returned home at 4:00 p.m. Defendant then ascertained that Imelda "was catching flu" and that she was coughing "[a] little bit," but noted that Imelda was having no trouble breathing. Defendant gave Imelda more medication and the rest of the day off, and Imelda went down to the basement to rest.
During dinner, at approximately 9:30 p.m., defendant informed Ejaz that Imelda had the flu and had not yet eaten. Ejaz went to the basement and discovered Imelda's body. After defendant determined that Imelda was dead, she went back upstairs and picked up the telephone to dial 911, but was dissuaded by Ejaz and Lolita:
A I went up and they followed me. I took the telephone. I was going to call 911. And Ejaz said .... no, she died in my house, you're Philippino, I'm Pakistani,... they're going to blame us. I said no, they're not. He said she's illegal here, I brought her here illegally, if my company finds out I'm going to lose my job. Your sister is here illegally, he said they'll arrest her and deport her. I was so confused. I didn't know what to do.
Q Did you look to your sister at that time?
A Yes. She was begging she cannot go home.
....
Q Did you pick up the phone to call again?
A No. Ejaz said he's going to take care of it, to trust him, ... that she's already dead, nobody else can do anything for her any more, that her shell is just there but her spirit is gone.
....
Q As a result of what Lolita said to you and as a result of what Ejaz said to you what happened? What was done?
A We did not bury her in the back yard. WeEjaz said that he's going to call his friend and his friend is going to help him dropput the body in some place where she could be found and she could be buried.
Q And did Ejaz make a call from your house?
A Yes. He called his friend and they spoke in his Pakistani language. I did not understand.
Q And then did he leave the house to make another call?
A Yes. He has to use the outside phone and call his friend.
Q After leaving the house did there come a time when he came back to the house?
A Yes. After a while he came back and he said his friend cannot help him.
....
Q And as a result of what he said what did you and Lolita and Ejaz do?
A We help him. We went down to the basement, we said a prayer and we wrap her in a sheet.
Q And was she brought anywhere?
A The three of us help him. We brought her to the garage.

*142 Q And after bringing her to the garage where did you all three go?
A We went to bed.
Three of defendant's co-workers and two of her friends testified on her behalf. One described defendant as a professional, very competent nurse who was compassionate toward patients. She found defendant's temperament to be "frank and assertive," but not mean-spirited. She had never seen defendant throw or bang charts or abuse her co-workers in any fashion, and had only heard of such conduct through the allegations of other co-workers during the course of the investigation.
Two other co-workers agreed that neither of them knew defendant to have a bad temper, and that they had never seen defendant verbally or physically abuse patients or co-workers or bang or throw charts. One co-worker stated that she had heard defendant refer to Imelda as "SLB." The other noted that defendant got along well with some nurses but not others, that two of the State's witnesses were part of a clique that "didn't like" defendant, and that during the investigation, she had overheard them saying they were going to call the prosecutor and "tell them what she had did."
Another defense witness, a classmate from the Philippines, began socializing with defendant in 1995, and "never saw her very angry .... [or] upset." She observed Imelda at defendant's home on at least three occasions, and found her to be shy, neat, and healthy, and not injured or upset in any way. Another friend and classmate corroborated that description of Imelda, and described defendant as a "very loving," "hard-working," and "devoted" mother and wife who had a "very objective" temper and "never raised her fists or anything."

C.
At the close of the State's evidence, juror 10 reported to the judge that juror 13 had been "discussing the case with an attorney." In the presence of counsel and defendant, the judge conducted a voir dire of each juror. The voir dire revealed that juror 3 had overheard an unidentified juror say that she had a friend who was an attorney, and that the attorney said the jury was "probably being recorded." Juror 10 revealed that she had overheard juror 13 stating to jurors 2, 11, and another unidentified juror that juror 13 had spoken about the case with a friend who was an attorney:
JUROR [10]: ... [W]hat she said was I spoke to my friend who's a lawyer and she said that the case is going to go this way or that way, and exactly what she said as far as this way or that way I don't remember, but when she said that she was speaking to her friend and her friend was a lawyer it was almost as if she was speaking and trying to make herself an authority....
....
THE COURT: Was it like procedure, how long are you going to be there, the case is almost over, or was it about the outcome itself, what the decision would be or what the decision should be or ought to be?
JUROR [10]: It was more what the decision should be.
THE COURT: It was more what the decision should be?
JUROR [10]: And the fact that she hadshe doesn't particularly care for one of the attorneys and that was one of the issues that she was speaking about with her friend, the lawyer.
....
[PROSECUTOR]: Was she more specific?
*143 JUROR [10]: She wants very little to do with you, the prosecutor.
....
[DEFENSE COUNSEL]: When you say about the case going this way or that way did she say anything? Was there something more specific about that?
JUROR [10]: In my opinion it's more like she's trying to get people to agree with her on what her thoughts are along the case lines and where she thinks the case should be and the progression of the case.
[DEFENSE COUNSEL]: Did she say where she thinks the case should be or express what her thoughts were to these other jurors?
JUROR [10]: To herto the few that she talks to I'm sure, but I don't know exactly.
[DEFENSE COUNSEL]: You don't know exactly what she said?
JUROR [10]: No.
....
[PROSECUTOR]: Have any of the other jurors responded to her comments that heard?
JUROR [10]: No one's really buying into what she's saying, but it's just the point that I feel that she's trying to be forceful and pushing people to think along her lines. There's a few people that I think are kind ofthat would follow her if given the chance.
[DEFENSE COUNSEL]: Did she say how she thought the case should be decided? Did she ever say that?
JUROR [10]: Not exactly.
....
[PROSECUTOR]: Were you with any of the other jurors that you can remember when you overheard the conversation?
JUROR [10]: Let's see. Number one was there and also ... number 12 ... [a]nd I think the woman that sits here.
....
[PROSECUTOR]: Was there any comment among those other jurors, the ones you were with, about oh, gee, I just heard what she said and did you hear what she said?
JUROR [10]: Well, first comment [sic] was I can't believe she said that.
....
THE COURT: Anything else?
[DEFENSE COUNSEL]: That's all I have.
....
[DEFENSE COUNSEL]: I just want to say I think we should keep juror 13 now.
Juror 13 admitted that she had a close personal friend who was a lawyer, but denied that she had any discussion with that friend concerning the case or its outcome, had told any member of the jury she had done so, or had any discussions with other jurors about "what the outcome should be." She admitted that she had expressed a preference for one of the attorneys in the case. The remaining jurors admitted that there had been general discussions about the personalities of the attorneys and the dynamics of their interaction with the judge, but stated that they had not heard any conversations indicating that a fellow juror had been discussing the case with a friend who was an attorney.
Following the voir dire, the prosecutor noted that he found juror 10 to be credible in light of her accurate knowledge that juror 13 had a close personal friend who was a lawyer. Although he was "very seriously concerned" that the alleged discussions concerning the outcome of the case might have taken place, and that the jurors were thus not only tainted, but unwilling *144 to be forthright about what they had heard, he left the matter to the judge's discretion.
Defendant elected to proceed with the jury:
[DEFENSE COUNSEL]:.... Well, Judge, I think it's either all or nothing at all at this point. The only thing definite that came out in terms of what was discussed was that apparently supposedly juror number 13 doesn't care for the prosecutor. For all I know there may be other jurors on there that don't care for me ... so I don't think what the jurors may think of the personalities of the judge or the prosecutor or the defense attorney is grounds to excuse any juror, so I don't think that anything else beyond that actually has been established.... I know that if you go by what [juror 10] said and you believe that there were discussions about the case this way or that that may have affected other jurors then, you know, juror number two has to go, juror number 11 has to go because they were involved allegedly according to [juror 10] in these discussions with [juror 13]. Juror number 12 was there when she overheard it. Juror number one was there. Juror number seven was there. They all denied overhearing anything or anything improper going on, so if you believe her and not them then those jurors have to go, so you don't have a jury left, so it's either everybody stays or everybody goes at this point as I see it because if you're going to excuse [juror 13] just on the sayso of [juror 10] then based upon her sayso a lot of other people have to be excused and probably she has to be excused because she may have been adversely affected against us based upon the efforts of [juror 10] as she claims they were to influence jurors in some vague unspecified way. I mean she mentioned this way or that way, but she didn't mention anything about something specific as to what it should be, so I'm going to
THE COURT: Are you telling me then that I should not excuse any of these jurors and that you are as a defense attorney satisfied that this jury can still reach a verdict, a fair and impartial, a just verdict based on the evidence and not on any extraneous or outside influences?
[DEFENSE COUNSEL]: Yeah. I believe based upon what I have heard that there was nothing specific to indicate that that couldn't be done. The only thing that I heard definitely was that there were discussions about the people involved in the case and I don't find that to be unusual.
The judge agreed that despite juror 10's "pretty credible" allegation that some of the jurors may have overheard conversations to the effect that juror 13 had spoken to a "lawyer friend," there was no specific indication that juror 13's conversations with the lawyer or other jurors had focused upon what the outcome of the case should be rather than merely upon how the case was going and what was going to happen next. The judge found that the jury could and would reach a fair verdict based upon the evidence and no other considerations. He declined to declare a mistrial or to excuse any juror, but gave an immediate instruction when the jury reconvened emphasizing and expanding upon the routine instructions he had already delivered daily throughout the course of the trial:
Once again I want to remind you that you are not to discuss this matter amongst yourselves, you're not to discuss this matter with anyone else, anyone else, members of your family, friends, relatives or anyone else. You *145 are to decide this matter based on the evidence that is presented in this courtroom and you are to decide this matter based on the law as I give it to you, as I dictate it to you. You've taken an oath to do that. You've all taken an oath to do that and I want to remind you in the strongest possible terms that you are not to discuss the matter with anyone, you are not to allow anyone else to discuss the matter with you. You are to decide the matter based on what you've heard and seen in this courtroom and you are to decide the matter based on these exhibits that are about to be shown to you and nothing else.
At the close of all the evidence, defendant submitted a request that the jury be charged on the testimony of character witnesses to emphasize that the positive testimony of defendant's friends and co-workers to the effect that she was a calm, compassionate, and caring professional might counterbalance her co-workers' testimony to the effect that defendant had a bad temper and a penchant for banging and throwing things at work. The judge denied the application, stating:
There was no proper character testimony. There could have been, but there was none offered in this particular case. The defense witnesses that were produced did testify that this lady never got angry, that she neverthey never saw her throwing anything down or some of the other things that the nurses testified. Certainly you can argue that to the jury, but that's not character evidence as is contemplated by the rule or by the law. Certainly you can argue that the State's witnesses should not be believed in the balance of things because you have people who say she never got angry, never threw anything, was even-tempered, other people said she got angry, she cursed, she hollered, and it's a credibility issue and I think in my credibility charge I'll deal with that. Certainly you can argue it in your summation, but it's not character testimony, so I will not be charging the character model charge.
The jury returned a guilty verdict.

II.
Defendant raises the following points on appeal:
POINT I
THE TRIAL COURT ERRED IN COMPELLING MR. BALUCH TO TESTIFY AGAINST HIS WIFE AFTER BOTH DEFENDANT AND MR. BALUCH ASSERTED MARITAL PRIVILEGE PURSUANT TO N.J.R.E. 501(2) TO PRECLUDE HIS TESTIMONY.
POINT II
IT WAS ERROR FOR THE TRIAL COURT TO ADMIT MR. BALUCH'S STATEMENT TO MIAN HUSSAIN AS A PRIOR INCONSISTENT STATEMENT AND SUBSTANTIVE EVIDENCE OF GUILT BECAUSE THE STATEMENT WOULD NOT HAVE BEEN ADMISSIBLE IF MADE BY MR. BALUCH WHILE TESTIFYING AT DEFENDANT'S TRIAL.
POINT III
THE MEDICAL EXAMINER'S TESTIMONY THAT THE CAUSE OF DEATH WAS "HOMICIDE" EXCEEDED THE SCOPE OF PERMISSIBLE FORENSIC EXPERT TESTIMONY AND IMPROPERLY ADDRESSED THE ULTIMATE ISSUE BEFORE THE JURY, THUS DEPRIVING DEFENDANT OF A FAIR TRIAL AND REQUIRING REVERSAL OF HER CONVICTION FOR RECKLESS MANSLAUGHTER. (Not Raised Below).
*146 POINT IV
THE ADMISSION OF EVIDENCE CONCERNING PRIOR OCCASIONS ON WHICH DEFENDANT ALLEGEDLY SLAPPED AND YELLED AT THE VICTIM, IN COMBINATION WITH BAD CHARACTER EVIDENCE CONCERNING DEFENDANT'S PROPENSITY FOR VIOLENCE, DEPRIVED HER OF A FAIR TRIAL.
POINT V
THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING DEFENDANT'S REQUEST TO CHARGE THE JURY ON EVIDENCE OF DEFENDANT'S GOOD CHARACTER.
POINT VI
THE TRIAL COURT'S FAILURE TO DECLARE A MISTRIAL OR AT LEAST EXCUSE JUROR NO. 13, AFTER A VOIR DIRE REVEALED THAT SHE AND SEVERAL OTHER JURORS MAY HAVE BEEN TAINTED BY OUTSIDE INFLUENCES VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL JURY AND REQUIRES REVERSAL OF HIS [sic] CONVICTIONS U.S. CONST. AMEND. VI; N.J. CONST. (1947), ART. 1 PAR. 10. (Not Raised Below).
POINT VII
THE TRIAL COURT DENIED DEFENDANT'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS BY EXCLUDING ADMISSIBLE AND RELEVANT STATEMENTS MADE BY THE VICTIM REGARDING HER PHYSICAL CONDITION IN THE HOURS PRECEDING HER DEATH.
We address each issue in turn.

A.
Defendant first contends that the trial judge erred by compelling Ejaz to testify at defendant's trial after both he and defendant asserted the spousal privilege to preclude his testimony under N.J.R.E. 501(2). Defendant claims that the Baluchs moved for severed trials in anticipation of Ejaz' inculpation of defendant to secure his acquittal, and thus, did not waive the privilege when Ejaz "shifted the blame" to defendant at his own trial.[1] We disagree.
Testimonial privileges are to be narrowly construed because they "`contravene the fundamental principle that the public ... has a right to every man's evidence.'" State v. Szemple, 135 N.J. 406, 413, 640 A.2d 817 (1994) (quoting Trammel v. United States, 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (1980) (internal quotations omitted)). Such privileges block "the path of the normal trial objective of a search for ultimate truth," ibid. (quoting State v. Briley, 53 N.J. 498, 506, 251 A.2d 442 (1969)), and are recognized only where they "serve a more important public interest than the need for full disclosure," id. at 414, 640 A.2d 817 (quoting Briley, supra, 53 N.J. at 506, 251 A.2d 442); State v. Shahamet, 228 N.J.Super. 340, 344, 549 A.2d 884 (App.Div.1988).
*147 The spousal privilege "does not attract generous and sympathetic application." State v. Ospina, 239 N.J.Super. 645, 651, 571 A.2d 1373 (App.Div.), certif. denied, 127 N.J. 321, 604 A.2d 597 (1990). It is not of constitutional dimension, id. at 653, 571 A.2d 1373, United States v. Hicks, 420 F.Supp. 533, 536, 538 (N.D.Tex.1976), and is only intended to promote the public interest in preserving marital harmony by preventing the discord, repugnance, and humiliation presumed to attend the compelled condemnation of one spouse by another in a criminal proceeding, Briley, supra, 53 N.J. at 505, 251 A.2d 442; Ospina, supra, 239 N.J.Super. at 649-50, 571 A.2d 1373. This codified common-law privilege is wholly independent of and not to be confused with the constitutionally-protected right of confrontation, U.S. Const. amend VI, and the privilege to testify on one's own behalf, U.S. Const. amend V.
New Jersey's spousal privilege, codified at N.J.R.E. 501, provides, in relevant part, that "[t]he spouse of the accused in a criminal action shall not testify in such action except to prove the fact of marriage unless (a) such spouse consents." N.J.R.E. 501(2)(a); N.J.S.A. 2A:84A-17(2)(a). The privilege was significantly narrowed in scope in 1992, L. 1992, c. 142, by eliminating the accused's right to prevent a spouse from testifying and maintaining the right solely for the witnessspouse.[2]See State v. Szemple, 263 N.J.Super. 98, 103, 622 A.2d 248 (App.Div.1993), aff'd, 135 N.J. 406, 640 A.2d 817 (1994); State v. Lado, 275 N.J.Super. 140, 153 & n. 7, 645 A.2d 1197 (App.Div.), certif. denied, 138 N.J. 271, 649 A.2d 1290 (1994); Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 501(2) (2001). Ejaz alone was the holder of the privilege at defendant's trial.
The privilege is not self-executing, and may be waived by a testifying spouse's voluntary disclosure of a privileged matter, N.J.R.E. 530; State v. Walker, 80 N.J. 187, 192, 403 A.2d 1 (1979), or by "the absence of timely assertion by counsel, whether or not the accused has approved the nonassertion or is even aware of the issue," Ospina, supra, 239 N.J.Super. at 654, 571 A.2d 1373. See also ibid. (noting that Evid. R. 37, now N.J.R.E. 530, "does not purport to be exclusive or to list every way in which a privilege can be waived").
N.J.R.E. 530 provides, in relevant part, that "[a] person waives his right or privilege to refuse to disclose ... a specified matter if he ... has ... without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter." N.J.R.E. 530; N.J.S.A. 2A:84A-29. Ordinarily, a witness who voluntarily waives a privilege at one trial irrevocably waives the right to refuse to testify about the disclosed matter at all subsequent trials. Biunno, supra, comment on N.J.R.E. 530. Cf. State v. Toscano, 13 N.J. 418, 423, 100 A.2d 170 (1953); State v. Allah, 334 N.J.Super. 516, 522, 760 A.2d 328 (App.Div.2000), certif. granted, 167 N.J. 633, 772 A.2d 934 (2001); Ospina, supra, 239 N.J.Super. at 654, 571 A.2d 1373.
Consistent with our obligation to construe and apply the spousal privilege "`in sensible accommodation to the aim of a just result,'" Szemple, supra, 135 N.J. at 414, 640 A.2d 817 (quoting Briley, supra, 53 N.J. at 506, 251 A.2d 442), and mindful of our inability to unilaterally narrow the *148 privilege by judicial fiat, see Ospina, supra, 239 N.J.Super. at 650-51, 571 A.2d 1373 (considering the merits of the federal "joint participants" exception to the spousal privilege and noting that a privilege which "protect[s] the harmony of marital bonds forged in shared criminality" may have little to recommend it); c.f. Shahamet, supra, 228 N.J.Super. at 344, 549 A.2d 884 (noting that "`the adoption of a privilege restricting the flow of evidence is a substantial policy decision uniquely within the competence of the Supreme Court or the Legislature'"), we conclude that under the facts and circumstances of this case, Ejaz' voluntary testimony publicly incriminating his co-indicted wife at his own trial dissipated any public interest in preserving the harmony of their union, brought the quest for truth concerning the circumstances of Imelda's death to the fore, and waived Ejaz' spousal privilege in all subsequent related criminal proceedings, including defendant's trial. Cf., e.g., Ospina, supra, 239 N.J.Super. at 651, 571 A.2d 1373 ("`When one spouse is willing to testify against the other in a criminal proceedingwhatever the motivationtheir relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve.' ") (quoting Trammel, supra, 445 U.S. at 52, 100 S.Ct. at 913, 63 L.Ed.2d at 196); Briley, supra, 53 N.J. at 506, 251 A.2d 442 (when "no violence is done to the privilege ... the testimony should be received").
State v. Ospina, supra, 239 N.J.Super. 645, 571 A.2d 1373, guides our analysis. In Ospina, decided prior to the adoption of the present rule, we held that a defendant who was co-indicted and tried with his wife on drug-related charges had waived his privilege to preclude her testimony by waiting until the close of the State's evidence to assert it. Id. at 652-54, 571 A.2d 1373. We observed that although "[t]he realistic prospect that a co-indicted spouse would choose to testify on [his or] her own behalf is sufficient reason to order severance of trial," neither co-defendant ever indicated that one might testify adversely to the other. Id. at 652-53, 571 A.2d 1373 (citing State v. Infinito, 180 N.J.Super. 75, 79, 433 A.2d 816 (App.Div.1981) (Joelson, J., concurring); State v. White, 195 N.J.Super. 457, 460, 480 A.2d 230 (Law Div.1984)). The wife's denied pretrial severance motion had been advanced on the theory that her husband would testify and exculpate her if he was tried first. Ibid. Defendant's mistrial and severance motions after his wife's counsel forecast defendant's exculpatory testimony in his opening statement were likewise denied. Id. at 652-53, 571 A.2d 1373. Again, there was no mention of the possibility that either spouse intended to inculpate the other. Ibid. When the trial judge denied defendant's belated motion to bar the wife's testimony at the close of the State's case on the ground that defendant had waived the privilege by waiting too long to assert it, we did not hesitate to conclude that "[w]hatever the reason" for defendant's delay, including defense counsel's failed strategy or mere delayed recognition of the issue, "the lateness of the hour was sufficient cause to bar assertion of the privilege, and ... [to] visit[ ] on defendant the outcome of the game plan, where the outcome is the admission of highly relevant testimony." Id. at 653-54, 571 A.2d 1373.
Here, as in Ospina, despite their muchbelated claims to the contrary, the record is devoid of any suggestion that Ejaz and defendant moved for severed trials in anticipation of testifying in their own interest and against one another. We conclude that the Baluchs' trials were severed due *149 to Bruton[3] concerns, because "all parties perceived that some evidence admissible as to one defendant would be inadmissible as to the other" and "[t]hese `differently admissible' proofs were perceived as being too numerous and too significant for a joint trial." Neither Ejaz nor defendant "unequivocally made [the requisite] pretrial motion for severance based upon the marital privilege and ... proffered to the court the exact nature of the expected testimony." Infinito, supra, 180 N.J.Super. at 80, 433 A.2d 816 (Joelson, J., concurring), White, supra, 195 N.J.Super. at 460, 480 A.2d 230. To the contrary, they simply miscalculated the purpose, scope, and magnitude of the spousal privilege in relation to other privileges, as well as the effect that an unexpressed or undeveloped "game plan" of exculpating Ejaz by inculpating, defendant would have upon the latter's trial.
Ejaz had already waived the spousal privilege when on direct examination at his own trial, he inculpated defendant and testified that she verbally and physically abused Imelda. This occurred before the possibility that he might be called to testify at defendant's trial was even recognized by Ejaz. Even then, he only belatedly weighed the advantages of characterizing defendant's incriminating statements as inadmissible hearsay in order to preserve the confidential marital communications privilege, N.J.R.E. 509,[4] not at issue here, cf. White, supra, 195 N.J.Super. at 459 n. 1, 480 A.2d 230, against the advantages of admitting those statements under the hearsay exception for statements made in furtherance of a conspiracy, N.J.R.E. 803(b)(5), so as to exculpate himself:
Q Did you ever see [defendant] verbally or physically abuse Imelda?
A She would sometime [sic] get upset at her andand call her some words or get loud and there were a few occasions that she slapped her.
Q Ejaz, did [defendant] have a short temper?
A She does.
Q Did you ever see [defendant] hit Imelda?
A Two times I saw her.
Q And what kind of hits were they?
A She slapped her.
Q And you saw this?
A Yes.
Q What did you say?
A I told her not to do that because it'sI don't want her to be hitting Imelda or anybody and I told her it's not good. I never hit anybody. And, as a matter of fact, there was one time we were driving and Lolita was there and defendant and that day they said it happened and I told [defendant], I said if you will ever do this again I'm telling you I'll send her back to her country and your sister will take care of the children. And my wife didn't like that, you are saying about Lolita, why she take care of the children, she has her own job. I told her you better stop doing this.
Ejaz then testified at his trial that after Imelda's body was discovered in the basement:

*150 A.... I said cannot be natural death, she's only 28-years old.... I pick up the phone and said I'm going to call the police. [Defendant] started crying.
Q Did [defendant] and Lolita then speak to you?
A Yes. They ask me not to call the police.
[PROSECUTOR]: I'm going to ask that be stricken, Judge. Objection.
THE COURT: I'm going to go to sidebar. Let's go to sidebar.
(The following is at sidebar.)
THE COURT: Counselors, sort of refresh my recollection. At some point we were talking about a conspiracy. We were talking about statements being admissible, if they were in furtherance of the conspiracy. How close are we to that now?
[EJAZ' COUNSEL]: Well, I have this problem.
THE COURT: Because now we're talking about the disposal of the body.
[PROSECUTOR]: No. We're talking about callingcalling the police.
[EJAZ' COUNSEL]: I have no objection to the prosecutor's objection if he wants to object.
THE COURT: I understand. I called you guys over here because you remember we had a discussion with respect to the admission of other statements and my ruling was that they were admissible even though they were hearsay because they were in furtherance of a conspiracy.
[EJAZ' COUNSEL]: Correct.
THE COURT: I want to be consistent in my ruling here.
[EJAZ' COUNSEL]: Here's the problem I have, Judge, and I thought of it last night. I think he has a privilege with respect to his wife if he's ever called to testify.
[PROSECUTOR]: Privilege doesn't exist any more.
[EJAZ' COUNSEL]: Ifif he says something here in this trial, a conversation of his wife which he's objected to, I think he may waive that privilege for future proceedings, but I'm not absolutely positive, so it's hearsay. It's hearsay.
THE COURT: It's hearsay. I don't have any problem with the fact that it's hearsay, so the objection is well taken. I just remembered
[EJAZ' COUNSEL]: Yeah. I agree.
THE COURT:that I allowed some hearsay in based on the State's argument that it was in furtherance of a conspiracy and, therefore, it was admissible. And I want to be consistent in my rulings. That's all I'm saying.
[EJAZ' COUNSEL]: Thank you.
In the shadow of his own trial testimony and his later admitted "game-plan" of "shifting the blame," we conclude that Ejaz waived his spousal privilege to refuse to testify against defendant by "elect[ing] the strategy of playing [his] cards close to the vest" and not raising the issue and making a proffer of his proposed inculpatory statements as grounds for severance. See White, supra, 195 N.J.Super. at 460, 462, 480 A.2d 230 (finding that only co-defendant's wife successfully asserted the privilege because she made a proper proffer in camera before severance). Having abrogated any public interest in preserving their marital harmony after Ejaz' highly publicized trial by exposing them both to the discord, repugnance, and humiliation of his voluntary condemnation of defendant, the Baluchs "should not be allowed to complain successfully now that their strategy has backfired." Infinito, supra, 180 N.J.Super. at 80, 433 A.2d 816 (Joelson, J., concurring); White, supra, 195 *151 N.J.Super. at 459-60, 480 A.2d 230. Were we to hold otherwise, "a procedural rule intended solely to promote marital harmony [would] become[ ], if not a suit of armor against the weapons of truth ascertainment in a criminal prosecution, at least a bullet-proof vest," Infinito, supra, 180 N.J.Super. at 77, 433 A.2d 816, and an "intolerable disruption of the criminal justice processes," Ospina, supra, 239 N.J.Super. at 654, 571 A.2d 1373. We will not, under the guise of a claim of privilege, countenance such conduct. Privileges serve an important purpose, grounded in critical public policy concerns, but we cannot permit the conduct described here to be protected by this abuse. We reject defendant's claim of error.

B.
Defendant also contends that the trial judge erred by admitting Ejaz' prior inconsistent statement concerning his conversation with Hussein both for impeachment purposes and substantively for its truth. She claims this is so because the statement "would not have been admissible if made by [Ejaz] while testifying at [defendant's] trial" as sufficiently reliable under N.J.R.E. 803(a)(1) and as an exception to the rule against hearsay as an exited utterance under N.J.R.E. 803(c)(2), a statement by a party-opponent under N.J.R.E. 803(b)(1), or a statement against Ejaz' penal interest under N.J.R.E. 803(c)(25).
Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). It is inadmissible absent an exception to the rule against hearsay. N.J.R.E. 802. N.J.R.E. 803(a)(1) governs the admissibility of witnesses' prior inconsistent statements, and provides, in pertinent part:
The following statements are not excluded by the hearsay rule:
(a) Prior statements of witnesses. A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:
(1) is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613. However, when the statement is offered by the party calling the witness, it is admissible only if, in addition to the foregoing requirements, it (A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial ... proceeding[.]

[N.J.R.E. 803(a)(1) (emphasis added).]
The quantum and quality of proof required to establish the antecedent reliability of a witness' prior inconsistent statement under N.J.R.E. 803(a)(1) depends upon the form of the statement and whether it is offered by the party propounding or adverse to the witness. The rule favors the "broad admissibility" of prior inconsistent statements offered by an adverse party, and thus imposes no "special reliability" requirement in addition to the core admissibility requirements of N.J.R.E. 803(a)(1) that the prior statement be inconsistent with the witness' trial testimony, offered in compliance with N.J.R.E. 613, and independently admissible under a hearsay exception. See, e.g., State v. Leopardi, 305 N.J.Super. 70, 81-82, 701 A.2d 952 (App. Div.1997), certif. denied, 153 N.J. 48, 707 A.2d 152 (1998); State v. Pasha, 280 N.J.Super. 265, 268, 270-71, 655 A.2d 92 (App.Div.), certif. denied, 142 N.J. 453, 663 A.2d 1360 (1995). However, where the proponent of the witness offers the witness' prior inconsistent out-of-court statement *152 for any purpose, the admissibility of the statement is further limited by the additional requirement of a threshold showing that the statement was given "in a form and under circumstances importing special reliability." Id. at 107, 701 A.2d 952 (internal quotation marks omitted); N.J.R.E. 803(a)(1)(A), (B); Biunno, supra, comment 2 on N.J.R.E. 607 (noting that a prior inconsistent statement offered for impeachment purposes must also comply with the requirements of N.J.R.E. 803(a)(1)). It is well established that a propounding party witness' out-of-court written or recorded statement sought to be admitted under N.J.R.E. 803(a)(1)(A) (formerly Evid. R. 63(1)(a)(i)) must be evaluated by the trial judge at an N.J.R.E. 104 or "Gross" hearing outside of the jury's presence considering a number of factors "to determine whether the statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." State v. Spruell, 121 N.J. 32, 46, 577 A.2d 821 (1990) (quoting State v. Gross, 216 N.J.Super. 98, 110, 523 A.2d 215 (App.Div.1987), aff'd, 121 N.J. 1, 577 A.2d 806 (1990)).
However, where the statement is the witness' own voluntary prior sworn testimony sought to be admitted under N.J.R.E. 803(a)(1)(B) (formerly Evid. R. 63(1)(a)(ii)), no antecedent reliability hearing is required. This is so because such statements are already considered to be sufficiently reliable as substantive evidence of the matter asserted by virtue of the inherent trustworthiness of testimony given under oath before a fact finder while subject to contemporaneous cross-examination. See State v. Mancine, 124 N.J. 232, 246, 590 A.2d 1107 (1991); State v. Caraballo, 330 N.J.Super. 545, 554-55, 750 A.2d 177 (App.Div.2000); State v. Laboy, 270 N.J.Super. 296, 305, 637 A.2d 184 (1994). N.J.R.E. 803(a)(1)(B) does not superimpose a heightened requirement of proof of additional "special reliability" upon the prior testimony of a testifying declarant even if it tends to inculpate an accomplice or co-defendant. See State v. Gross, 121 N.J. 1, 10-15, 577 A.2d 806 (1990). But see State v. Johnson, 287 N.J.Super. 247, 261, 670 A.2d 1100 (App.Div.), certif. denied, 144 N.J. 587, 677 A.2d 759 (1996) (affirming the trial judge's Gross hearing reliability finding of a recalcitrant murder trial witness' prior inconsistent grand jury testimony inculpating defendants). To require a reliability hearing to test Ejaz's statement from his plenary jury trial would, in essence, amount to a retrial of Ejaz and call into question the jury's fact-finding. Such a result creates an untenable anomaly. We are satisfied that the inherent reliability requirement of prior sworn testimony under N.J.R.E. 803(a)(1)(B) was met given Ejaz' voluntary testimony at his own trial, and note that the judge fully instructed defendant's jury on the factors he considered to be relevant in assessing the reliability of Ejaz' prior statement. As such, we need not delve into the further reliability of Ejaz' testimony under the "Mancine factors" to be considered under an N.J.R.E. 803(a)(1)(A) proffer as urged by defendant, see Mancine, supra, 124 N.J. at 248, 590 A.2d 1107, before turning directly to the issue of the admissibility of Ejaz' N.J.R.E. 803(a)(1)(B) prior inconsistent statement as an independent exception to the rule against hearsay.
Defendant concedes that the portion of Ejaz' prior testimony to the effect that he sought Hussein's aid to dispose of Imelda's body was admissible as a statement against his interest under N.J.R.E. 803(c)(25). She only contends that Ejaz' related self-exculpatory statement that he told Hussein defendant had beaten Imelda *153 on the day of her death should have been redacted or the entire statement barred pursuant to State v. Gomez, 246 N.J.Super. 209, 215, 587 A.2d 272 (App.Div.1991), because that allegation was incompetent and inadmissible under the personal knowledge requirement of N.J.R.E. 602 and any hearsay exception.
N.J.R.E. 602 provides, in relevant part, that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself." This rule poses no barrier to the admissibility of Ejaz' statement that defendant beat Imelda on March 11, 1996 and that Imelda fell down the stairs during the course of the beating. Both experts' testimony established that Imelda could have sustained consistent injuries had she fallen down a flight of stairs. Moreover, both Ejaz' and defendant's testimony established not only that Ejaz discovered Imelda's body immediately after a conversation with defendant, but that they decided to "dump" Imelda's body as a result of their subsequent conversation. This all occurred prior to Ejaz' call to Hussain. Such corroborative evidence was sufficient for a factfinder to conclude that Ejaz' statement to Hussein was based on personal knowledge gained through his conversations with defendant immediately before and after the discovery of Imelda's body. Whether Ejaz' or defendant's versions of what those conversations encompassed was a fabrication went to the weight of their testimony, and not to its admissibility. State v. Feaster, 156 N.J. 1, 78-80, 716 A.2d 395 (1998), cert. denied, ___ U.S.___, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001).
Although we agree with defendant that the portion of Ejaz' statement inculpating her was inadmissible as that of a party-opponent under N.J.R.E. 803(b)(1) or as against defendant's interest under N.J.R.E. 803(c)(25) because the statement was not made by defendant, we also agree with the trial judge that the statement was independently admissible both as an excited utterance under N.J.R.E. 803(c)(2) and as that of a co-conspirator under N.J.R.E. 803(b)(5).
N.J.R.E. 803(c)(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate" is not excluded by the rule against hearsay. Factors to be considered in determining whether the declarant's statement was truly spontaneous and made solely under the stress of excitement, rather than the product of an opportunity for deliberation and fabrication, include the circumstances of the event, the amount of time that transpired between the declarant's perception of the event and the utterance, the declarant's mental or physical condition, including the degree of shock produced, and the nature of the statement itself, including whether it was against the declarant's interest and whether it was volunteered or given in response to a question. Truchan v. Sayreville Bar and Restaurant, Inc., 323 N.J.Super. 40, 48-49, 731 A.2d 1218 (App.Div.1999); State v. Lazarchick, 314 N.J.Super. 500, 522, 715 A.2d 365 (App.Div.), certif. denied, 157 N.J. 546, 724 A.2d 804 (1998).
Defendant contends that the statement could not be an excited utterance "because [Ejaz] did not call Hussain until at least one hour after the body was discovered" and because the trial judge necessarily considered the possibility that Ejaz might have been "setting up a defense for [himself]" in light of the selfserving *154 nature of that portion of his statement inculpating defendant. Our recent explorations of the issue demonstrate that the determinative element is not the precise amount of time which elapsed between the event and the statement, but rather whether the facts and circumstances reasonably warrant the inference that the declarant was still under the stress of excitement caused by the event. Truchan, supra, 323 N.J.Super. at 49, 731 A.2d 1218; Lazarchick, supra, 314 N.J.Super. at 522, 715 A.2d 365. The passage of one hour or more between the event and an excited utterance is well within the parameters of prior decisions admitting such statements, Truchan, supra, 323 N.J.Super. at 49-50, 731 A.2d 1218 (collecting cases); Lazarchick, supra, 314 N.J.Super. at 522-23, 715 A.2d 365 (same), and testimony that the declarant was still in a state of "shock" at the time of the utterance is virtually dispositive of its admissibility, see State v. Swint, 328 N.J.Super. 236, 255 n. 4, 745 A.2d 570 (App.Div.), certif. denied, 165 N.J. 492, 758 A.2d 651 (2000); State v. Williams, 214 N.J.Super. 12, 19, 518 A.2d 234 (App.Div.1986); Biunno, supra, comment 1 on N.J.R.E. 803(c)(2). Although the trial judge correctly noted his concern that Ejaz might have contemplated "setting up" a defense by inculpating defendant prior to calling Hussain, he ultimately concluded that the circumstance of "just [having] discovered that the maid was dead" coupled with "a very short period of time" between that discovery and Ejaz' phone call to Hussain was sufficient to establish the spontaneity and admissibility of Ejaz' statement as an excited utterance. We find no abuse of discretion in that regard, particularly in light of the untenable logic that Ejaz inculpated defendant to induce Hussain's aid because Hussain hated her, rather than because Ejaz was still laboring under the stress of excitement. We also note that Ejaz' prior elicited testimony on direct examination at his own trial that he was still "in shock .... complete shock" in the five minutes preceding his statement to Hussain precluded his implicit claim to the contrary at defendant's trial. See Pressler, Current N.J. Court Rules, comment 13.5 on R. 4:5-4 (2001) (discussing the doctrine of judicial estoppel); Country-Wide Ins. Co. v. Allstate Ins. Co., 336 N.J.Super. 484, 491-92, 765 A.2d 266 (App.Div.2001) (same); Ramer v. New Jersey Transit Bus Operations, Inc., 335 N.J.Super. 304, 311-12, 762 A.2d 297 (App.Div.2000) (same).
Even if we were to exclude Ejaz' statement as inadmissible under the excited utterance exception to the rule against hearsay, there is an additional basis supporting admissibility. Ejaz' statements to Hussain are also admissible under the co-conspirator hearsay exception, N.J.R.E. 803(b)(5), which provides that "statement[s] made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong ... made in furtherance of that plan" are not excluded by the rule against hearsay. That is, a co-conspirator's statement is admissible under N.J.R.E. 803(b)(5) provided the statement was made in furtherance and during the course of the conspiracy and evidence independent of the hearsay itself establishes the existence of the conspiracy and the defendant's relationship to it. State v. Phelps, 96 N.J. 500, 510, 476 A.2d 1199 (1984); State v. Farthing, 331 N.J.Super. 58, 83, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000). There is no requirement that defendants be charged with conspiracy in order for the rule to apply. State v. Clausell, 121 N.J. 298, 336-37, 580 A.2d 221 (1990); State v. Carbone, 10 N.J. 329, 338-39, 91 A.2d 571 (1952). We conclude that Ejaz' and defendant's testimony plainly *155 demonstrated that Ejaz' statement to Hussain was made in furtherance of a conspiracy to hinder either Ejaz' or defendant's apprehension by seeking to induce Hussain's aid in disposing of Imelda's body, that the statement was made during the course of that conspiracy, and, as corroborated by the statement itself, that the Baluchs' plan to hinder their apprehension existed and that defendant participated in the plan. See State v. Taccetta, 301 N.J.Super. 227, 251, 253, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997); State v. Hunt, 115 N.J. 330, 366-69, 558 A.2d 1259, reconsideration denied, 117 N.J. 152, 564 A.2d 873 (1989); Biunno, supra, comment 5 on N.J.R.E. 803(b)(5). Cf. State v. Soto, 340 N.J.Super. 47, 62-63, 773 A.2d 739 (App.Div.2001).
We conclude that the judge did not abuse his discretion in finding that Ejaz' statement to Hussain was admissible as an excited utterance under N.J.R.E. 803(c)(2). We also conclude that the statement was independently admissible as a co-conspirator's statement under N.J.R.E. 803(b)(5).

C.
Defendant claims for the first time on appeal that the trial judge erred by permitting the medical examiner to testify that the manner of Imelda's death was homicide, N.J.R.E. 702, 704. This argument warrants little discussion. R. 2:10-2.
Defendant failed to object to such testimony not only on Ragasa's direct examination, but also to her own expert's similar testimony on cross-examination. Indeed, she invited both experts' explicit use of the term "homicide" by actively proposing it in the course of Ragasa's voir dire not only to ascertain his credentials, but to undermine his credibility as a forensic expert. Cf. State v. Jamerson, 153 N.J. 318, 340, 708 A.2d 1183 (1998). Under the plain error rule, we disregard alleged trial errors or omissions not "clearly capable of producing an unjust result," R. 2:10-2, and generally decline to consider issues not raised below. Pressler, supra, comments on R. 2:6-2 and R. 2:10-2 (2001); State v. Morton, 155 N.J. 383, 421, 715 A.2d 228 (1998), cert. denied, ___ U.S.___, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001); State v. Chew, 150 N.J. 30, 82, 695 A.2d 1301 (1997); State v. Marcus, 294 N.J.Super. 267, 293, 683 A.2d 221 (App.Div.1996), certif. denied, 157 N.J. 543, 724 A.2d 803 (1998).
Here, the medical expert's testimony was required to assist the jury in analyzing the significance of the sequence and severity of Imelda's various injuries and pneumonia relative to the cause of her death. His opinion that this was "a case of homicide," although bluntly articulated, was the functional equivalent of ruling out the possibility that Imelda's multiple injuries were self-inflicted or sustained as a result of mere inadvertence (i.e., accident). Moreover, the characterization was immediately qualified by his further expert opinion that Imelda did not die of natural causes because the pneumonia preceded her most severe injuries and, alone, would have been insufficient to cause her death. That testimony was neither the expression of a forbidden lay opinion unnecessary to the determination of a fact in issue within the ken of an average juror, nor a prohibited direct opinion that defendant was guilty of any form of homicide. Rather, it was a legitimate expert opinion that the instrumentality and manner of Imelda's death, were, in the words of defense counsel, "a human agency, [and] ... another human being."
As the judge properly charged the jury on expert testimony and witness credibility, defendant raised the issue on Ragasa's voir dire, and the defense expert also testified as to the possibility of homicide, we *156 perceive no error requiring our intervention. R. 2:10-2.

D.
Defendant also contends that the trial judge abused his discretion in denying her motion in limine to exclude Lolita's and defendant's co-workers' testimony concerning defendant's temperament and abusive conduct toward Imelda, and in admitting this and Ejaz' similar testimony, without her objection, as evidence of defendant's motive, intent, and identity for the murder charge under N.J.R.E. 404(b). She claims that the testimony concerning defendant's distaste for and prior physical abuse of Imelda was inadmissible under N.J.R.E. 404(b) because motive, intent, and identity were never in dispute and because defendant did not "open the door" to propensity character evidence under N.J.R.E. 404(a)(1). Specifically, defendant contends that the judge erred by failing to exclude, sua sponte: (1) Ejaz' testimony that defendant "slapped Imelda on two prior occasions, and ... had a bad temper and often yelled at Imelda"; (2) Lolita's testimony that defendant "was always upset with Imelda and hit her `lots of times'"; and (3) defendant's co-workers' statements that defendant banged patients' charts and spoke loudly at work when she was angry, referred to Imelda as "SLB" in conversation, and told them that she had slapped Imelda and pulled her hair, banged Imelda's head against a wall, and ordered Imelda to bang her own head against a wall.
As a threshold matter, we observe that defendant offered no objection to this testimony by Ejaz and Lolita at trial, and that her only objections to the co-workers' testimony challenged the statements as to relevancy, leading, and personal knowledge, and were interposed only with respect to defendant's acronym for Imelda, her temperament at work, and a telephone call. We also note that although N.J.R.E. 404 was never offered as a ground for any objection, and no immediate limiting instruction was requested, the judge nevertheless properly gave a "prior bad acts" limiting instruction after the first of defendant's co-workers testified for the State. See State v. Angoy, 329 N.J.Super. 79, 89-90, 746 A.2d 1046 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000) (noting that "a prompt delivery of limiting instructions, either before, simultaneously with, or immediately after, the admission of other crimes evidence is preferable, and ... should be standard procedure"). Finally, while defendant requested a character witness charge, defendant did not request a specific prior bad acts jury charge or challenge the judge's final limiting instructions that the testimony of defendant's co-workers could not be considered as propensity evidence, but rather only as: (1) evidence of defendant's motive, intent, state of mind, knowledge or purpose under N.J.R.E. 404(b) on the murder charge; (2) substantively as admissions against interest, N.J.R.E. 803(c)(25); and (3) as direct evidence of the second-degree aggravated assault charge, provided the jurors found the co-workers' testimony that defendant made those statements to be credible. Absent an objection, we address these issues under the plain error rule, R. 2:10-2, and necessarily infer that counsel perceived the alleged errors to be of no moment at the time of trial, State v. Eatman, 340 N.J.Super. 295, 298-99, 774 A.2d 571 (App.Div.2001); State v. Krivacska, 341 N.J.Super. 1, 39, 775 A.2d 6 (App.Div.2001); Swint, supra, 328 N.J.Super. at 255-57, 745 A.2d 570. We conclude that the evidence of defendant's temperament toward and prior physical abuse of Imelda was properly admitted under N.J.R.E. 404(b) as evidence of defendant's motive, state of mind, and identity, and was properly *157 submitted to the jury as evidence of her motive, intent, state of mind, knowledge or purpose as to the murder and lesser included charges of aggravated and reckless manslaughter. Her statements to her co-workers were properly admitted as statements against interest and as direct evidence of the second-degree aggravated assault and lesser included charges of third-degree aggravated assault and simple assault.
Even if that evidence had been improperly admitted as to the greater charges of murder and second-degree assault, the error would be harmless. The evidence was clearly admissible under N.J.R.E. 402, 403, 404(b), and 803(c)(25), as to those issues on the lesser included reckless manslaughter and assault charges. Moreover, the judge conveyed the "essential point" both in his immediate and final limiting instructions that the evidence was to be considered solely for those purposes as to the homicide and assault charges and not as proof of defendant's predisposition to commit the charged offenses. State v. Maristany, 133 N.J. 299, 309-10, 627 A.2d 1066 (1993); State v. Cofield, 127 N.J. 328, 341-42, 605 A.2d 230 (1992); State v. Stevens, 115 N.J. 289, 309, 558 A.2d 833 (1989), Eatman, supra, 340 N.J.Super. at 298-99, 774 A.2d 571. The jury plainly rejected the prior bad acts evidence as proof of the most significant charges against defendant. See Krivacska, supra, 341 N.J.Super. at 39, 775 A.2d 6 (noting that there was "little or no danger" that the jury improperly considered other crimes evidence as proof of defendant's general propensity to commit the crimes charged, as defendant was acquitted of one of the charges); State v. Sanders, 320 N.J.Super. 574, 592-93, 727 A.2d 1063 (App.Div.) (Steinberg, J. dissenting in part), aff'd, 163 N.J. 2, 746 A.2d 451 (2000).
"[E]vidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action" is relevant and admissible unless otherwise provided by the Rules of Evidence or law. N.J.R.E. 401, 402 (formerly Evid. R. 1(2), 7(f)). At the trial judge's discretion, relevant evidence may nevertheless be excluded, N.J.R.E. 403, unless it is offered by an accused in the form of reputation or opinion testimony as proof of his or her "good character," N.J.R.E. 404(a)(1), 405(a) (formerly Evid. R. 46, 47); Biunno, supra, comment 8 to N.J.R.E. 403; id., comment 4 to N.J.R.E. 403.
N.J.R.E. 404(a)(1) prohibits the admission of character evidence by a prosecutor as circumstantial proof of an accused's propensity toward the conduct charged unless the accused "opens the door" to such evidence by offering evidence of his or her pertinent good character traits. Hunt, supra, 115 N.J. at 369, 558 A.2d 1259. The rule provides, in relevant part:
Evidence of a person's character or a trait of his character ... is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except ... [e]vidence of a pertinent trait of the accused's character offered by the accused, which shall not be excluded under Rule 403, or by the prosecution to rebut the same.

[N.J.R.E. 404(a)(1).]
Like N.J.R.E. 404(a)(1) and 405(a), N.J.R.E. 404(b) (formerly Evid. R. 55) also prohibits the introduction of evidence of certain instances of conduct"other crimes, wrongs, or [bad] acts"as circumstantial proof of an accused's propensity toward the conduct at issue. However, the rule provides that "[s]uch evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or *158 absence of mistake or accident when such matters are relevant to a material issue in dispute," N.J.R.E. 404(b), without respect to order of proof. Significantly, neither N.J.R.E. 404(a)(1) or (b) prohibits the introduction of "bad character" evidence in the State's case in chief if it is offered for a purpose other than proving the accused's propensity toward the crime charged. See Biunno, supra, comment 3 to N.J.R.E. 404, Exception to usual sequencing rule. Thus, the purpose for which evidence is offered under these provisions of N.J.R.E. 404, and the form and order of such proof, are critical to determining not only its admissibility, but also what evidence may follow.
Although we agree that defendant's co-workers' inconsequential testimony concerning the slamming and banging of patients' charts was irrelevant to the crimes charged, we disagree that evidence of her temperament and apparent disdain for Imelda was improperly admitted in violation of N.J.R.E. 404(a)(1) because it violated the prescribed order of proof by adducing "bad character" evidence ahead of the good.
While we note that defense counsel directly broached the subject of defendant's "good character" in his opening statement by proclaiming that defendant was "a healer, not a harmer," we need not determine whether that non-evidentiary claim of defendant's propensity toward beneficence and non-violence could alone have "opened the door" to "bad character" rebuttal evidence concerning defendant's propensity for ill-tempered unkindness and physical violence toward Imelda under N.J.R.E. 404(a)(1). See Hunt, supra, 115 N.J. at 371, 558 A.2d 1259 (noting that even if defense counsel did not directly invite the prosecutor's inquiry about defendant's "bad temper," he "at least stimulated the response"). The trial judge ruled that defendant's temperament and course of conduct toward Imelda were to be admitted as directly relevant to the issues of motive, intent, and identity in the State's case in chief under N.J.R.E. 404(b), whether or not defendant had proffered good character evidence under N.J.R.E. 404(a)(1). See State v. DiRienzo, 53 N.J. 360, 384, 251 A.2d 99 (1969) (upholding admission of testimony that defendant was "dangerous" as proof of witness' credibility and motive, rather than of defendant's bad character); Biunno, supra, comment 3 to N.J.R.E. 404, Exceptions to usual sequencing rule. Moreover, on cross-examination of Ejaz, before Lolita and defendant's co-workers ever testified, defendant did "open the door" to N.J.R.E. 404(a)(1) character evidence outright by adducing Ejaz' testimony that defendant liked Imelda and was "very nice" and "fair" to her. Lolita's and defendant's co-workers' subsequent testimony concerning defendant's ill will and temper toward Imelda was properly admitted as rebuttal evidence to establish the contrary under N.J.R.E. 404(a)(1). See, e.g., State v. Steensen, 35 N.J.Super. 103, 106, 113 A.2d 203 (App.Div.1955) (noting that rebuttal evidence must be relevant to the charged offenses and fairly meet the good character evidence asserted).
We now consider the admissibility of defendant's "prior bad acts" under N.J.R.E. 404(b). Although "`courts should exclude evidence of other crimes, civil wrongs, or acts ... when such evidence is offered solely to establish the forbidden inference of propensity or predisposition,' " we recently stressed that N.J.R.E. 404(b) "does not bar other crime or civil wrong evidence in all instances," but rather "[b]y its clear terms" permits the admission of such evidence when relevant to prove a fact genuinely in dispute. Krivacska, supra, 341 N.J.Super. at 39, 775 A.2d 6 (quoting State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997)). See *159 Stevens, supra, 115 N.J. at 299, 558 A.2d 833. "Where such evidence tends to make the existence of material fact `reasonably likely' it should be admitted if its probative worth outweighs its potential for causing confusion, undue consumption of time or improper prejudice." Krivacska, supra, 341 N.J.Super. at 39, 775 A.2d 6; State v. Marrero, 148 N.J. 469, 482, 691 A.2d 293 (1997).
Under the four-part test announced in Cofield, supra, 127 N.J. at 338, 605 A.2d 230, prior "bad acts" evidence is admissible under N.J.R.E. 404(b) provided: (1) it is relevant to a material issue in dispute; (2) it is similar in kind and reasonably close in time to the charged offense; (3) the evidence of the prior bad act is clear and convincing; and (4) its probative value is not outweighed by its apparent prejudice. State v. Covell, 157 N.J. 554, 564, 725 A.2d 675 (1999); Nance, supra, 148 N.J. at 387, 689 A.2d 1351; Cofield, supra, 127 N.J. at 338, 605 A.2d 230. The admission of such evidence with respect to balancing is left to the sound discretion of the trial judge, and will not be reversed on appeal absent a clear error of judgment so wide of the mark as to result in manifest injustice. Ibid.; Marrero, supra, 148 N.J. at 483-84, 691 A.2d 293; Krivacska, supra, 341 N.J.Super. at 40, 775 A.2d 6; Sanders, supra, 320 N.J.Super. at 581, 727 A.2d 1063.
Evidence of a defendant's prior verbal and physical abuse of his or her victim may be relevant and admissible under N.J.R.E. 403 and 404(b) to establish motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident or other such matters when relevant to a material issue in dispute. See, e.g., Eatman, supra, 340 N.J.Super. at 297-98, 774 A.2d 571 (evidence of defendant's prior assaults of girlfriends, including homicide victim, admissible to show state of mind); Angoy, supra, 329 N.J.Super. at 85-88, 746 A.2d 1046 (evidence of defendant's prior choking of homicide victim admissible to show motive); Sanders, supra, 320 N.J.Super. at 588, 727 A.2d 1063 (Steinberg, J., dissenting in part) (collecting "a series of prior New Jersey cases [where] evidence of arguments or violence between a defendant and a homicide victim has been admitted" to establish state of mind or intent);
Defendant contests the admission of this evidence under N.J.R.E. 404(b) only on the ground that "there was no material issue to which [it] was relevant." Defendant asserts that she "never claimed that she injured Imelda `accidentally' or recklessly,' " and that "the heart of the defense was ... that Imelda had died from pneumonia" and that her injuries "were caused from a fall down the stairs due to her weakened condition rather than by anyone's assaultive conduct." We disagree. The issues of defendant's motive, intent, and state of mind, as well as the identity of Imelda's assailant, were in serious dispute. Indeed, defendant maintained that she liked Imelda and had never caused her injury, and that Imelda's injuries "were caused either accidentally or at the hand of someone else"presumably, as suggested by defense counsel, "a five-foot-nine inch, 165 pound man who gets massages as part of this nanny's duties." Moreover, despite Ejaz' claim that he lied to Hussain about Imelda having fallen down the stairs during the course of a beating delivered by defendant, that testimony also raised a genuine issue as to whether Imelda's fall down a flight of stairs, if any, was caused by her pneumonia or recklessly or intentionally caused by defendant. Defendant's prior physical abuses of Imelda were similar in kind and *160 consistent with the head and facial injuries Imelda sustained before her death. Defendant's co-workers described incidents that were part of an ongoing course of conduct during Imelda's seventeen-month stay with the Baluchs, and all were reasonably close in time to the events at issue.
We are satisfied that the probative value of this evidence was not outweighed by its potential for prejudice. As recently noted in a different context, acts of domestic violence "occur in the refuge of a home shielded from public view," where "[t]oo often the only people who know what occurred are the abuser and the abused." Sanders, supra, 320 N.J.Super. at 590, 727 A.2d 1063 (Steinberg, J., dissenting in part). "As a result, frequently other-crime evidence is necessary as the only means of proof of a genuine issue of contested fact." Ibid. Here, the evidence was clearly relevant and admissible to establish defendant's motive, state of mind, and intent to harm Imelda, and to negate the defense theory that Imelda's injuries had been caused by Ejaz or an accidental fall down the stairs due to her pneumonia. Because the evidence was offered for these purposes, and not for the sole purpose of establishing defendant's propensity of violence toward Imelda, we conclude that the trial judge did not abuse his discretion in admitting this critical evidence.
We also reject defendant's contention that the judge abused his discretion in admitting her co-workers' statements as direct proof of the second-degree (and lesser included) aggravated assault charges, which encompassed the entire period of time Imelda lived in defendant's home. Defendant asserts that proof that she "slapped" Imelda and "pulled her hair" was irrelevant to the greater charge that defendant purposely, knowingly, or recklessly caused Imelda's rib fractures, which defendant deems "the only serious bodily injury" alleged during that time frame. Defendant does not address the evidence of "head banging," or explain why Imelda's described head injuriesdimpling, bulging, and extensive hemorrhagingmight not also have constituted serious bodily injury, other than that the judge did not specifically discuss her head injuries, as he did the rib fractures. Although the judge read the definition of "serious bodily injury" to the jury, N.J.S.A. 2C:11-1a, he did not specify which of Imelda's injuries would satisfy that standard. The issue was for the jury to decide. State v. Sloane, 111 N.J. 293, 298-99, 544 A.2d 826 (1988). We note that Dr. Ragasa opined that Imelda's fat emboli might have been caused as a result of the rib fractures or any of her soft-tissue injuries, including her multiple blunt-force trauma head injuries. Given Imelda's head injuries, the evidence of head-banging was clearly relevant to the charge of second-degree aggravated assault, the testimony concerning hair pulling and slapping was admissible as an integral part of the mosaic of defendant's course of conduct toward Imelda during the time frame specified in the assault indictment, and the alleged error, if any, was harmless in any event in light of the jury's verdict that defendant was guilty of third-, and not second-degree aggravated assault. See State v. Cherry, 289 N.J.Super. 503, 522, 674 A.2d 589 (App.Div.1995) ("[e]vidence of events that take place during the same time frame as the crime charged in the indictment will not be excluded if the evidence establishes the context of the criminal event, explains the nature of, or presents the full picture of the crime to the jury"); Krivacska, supra, 341 N.J.Super. at 40, 775 A.2d 6 (discussing harmless error in light of jury's failure to convict on greatest charged offenses).

*161 E.

Defendant's contention that the trial judge erred by refusing to charge the jury on evidence of defendant's good character as offered by her co-workers and friends is clearly without merit. R. 2:11-3(e)(2). As previously noted, N.J.R.E. 404(a)(1) and 405(a) require that evidence of good character must concern a character trait pertinent to the charged offenses and must be in the form of reputation or opinion testimony. Defendant's friends' and co-workers' comments that she was "a hard-working nurse and devoted wife and mother" was wholly irrelevant to any pertinent character trait tending to show that she had no propensity to abuse household help, and the requested charge was thus properly denied. See e.g., State v. Reyes, 50 N.J. 454, 466-69, 236 A.2d 385 (1967) (affirming trial court's refusal to charge jury on murder defendant's own "good character" testimony of, essentially, no prior convictions); Steensen, supra, 35 N.J.Super. at 106-07, 113 A.2d 203 (noting that reputation or opinion evidence of good character must relate to a pertinent character trait).

F.
Defendant also contends, for the first time on appeal, that the trial judge erred by failing to either declare a mistrial or excuse juror number 13 sua sponte. We conclude that this issue is without merit, R. 2:11-3(e)(2), and does not warrant an extensive discussion. Suffice it to say that defendant not only failed to raise the issue at trial, R. 2:10-2, but affirmatively waived it by persuasively arguing outright both that juror number 13 should be retained and that the jury could still reach a fair and impartial verdict based solely upon the evidence and not upon any extraneous influences. "The defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure [s]he sought and urged, claiming it to be error and prejudicial." State v. Pontery, 19 N.J. 457, 471, 117 A.2d 473 (1955); State v. Pratt, 226 N.J.Super. 307, 315, 544 A.2d 392 (App.Div.), certif. denied, 114 N.J. 314, 554 A.2d 864 (1988). See also Brett v. Great Am. Recreation, 144 N.J. 479, 503-04, 677 A.2d 705 (1996) (noting that "[t]he doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error"); Pressler, supra, comments 2.5 on R. 2:10-1 and 13.5 on R. 4:5-4 (2001) (discussing invited error and judicial estoppel).
Even if defendant were not estopped from raising the issue, we find that the judge's procedural approach of investigating juror number 13's alleged misconduct by conducting individual voir dire of each juror with counsel and defendant present was entirely proper, and that the evidence adduced amply supported the judge's objective evaluation that the jurors, including number 13, could and would reach a fair verdict based solely upon the trial evidence. State v. Adams, 320 N.J.Super. 360, 364-69, 727 A.2d 468 (App.Div.1999); State v. Nelson, 318 N.J.Super. 242, 253-57, 723 A.2d 627 (App.Div.), certif. denied, 158 N.J. 687, 731 A.2d 47 (1999); State v. McLaughlin, 310 N.J.Super. 242, 257, 708 A.2d 716 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998); State v. Scherzer, 301 N.J.Super. 363, 487-88, 694 A.2d 196, certif. denied, 151 N.J. 466, 700 A.2d 878 (1997).

G.
Finally, we conclude that defendant's remaining argument that the trial judge *162 erred under N.J.R.E. 803(c)(3) by purportedly excluding Imelda's un-proffered statement on the day of her death "regarding her injuries being caused during an accidental fall down the stairs" is clearly without merit. R. 1:7-3; R. 2:10-2; R. 2:11-3(e)(2).
We note that defendant not only made no offer of proof concerning any testimony by defendant about Imelda's purported explanation for the bruise under her eye and the bump on her head on the morning of her death, but that immediately prior to the State's objection, defense counsel engaged in a speculative line of questioning and sidebar proffer suggesting that Ejaz might have been inebriated and attempted to sexually assault Imelda on the evening before her death. Absent any testimony from defendant concerning the stairs in her home, and any offer of proof to the contrary, the judge surmised, as do we from the record, that counsel was merely continuing the sexual assault line of questioning despite the judge's admonition that the testimony sought to be elicited was "totally irrelevant and immaterial to the issues before the jury." See e.g., Duffy v. Bill, 32 N.J. 278, 294, 160 A.2d 822 (1960) (noting that "[w]ithout such a specific offer of proof, which was not made here, it is virtually impossible for the appellate court in reviewing the case to determine whether the exclusion had a prejudicial effect, and, the burden of such a showing being on the appellant, there can be no remand for a new trial because of the exclusion without an offer of proof"); Dalton v. Barone, 310 N.J.Super. 375, 381, 708 A.2d 783 (App.Div.1998) (noting that "an attorney's procedural error may have ... adverse substantive effects upon a client .... [where] the record before us shows no error, and we are left with no basis to order a new trial other than the unsupported representation of the attorney"); State v. Millett, 272 N.J.Super. 68, 100, 639 A.2d 352 (App.Div.1994) (noting "[t]he `proper ground work' for consideration of the question on appeal must be laid by counsel or the point can be forfeited"); State v. Micci, 46 N.J.Super. 454, 458, 134 A.2d 805 (App.Div.1957) (noting that without an offer of proof "we glean from the questions by which counsel explored this subject before being interrupted by the definitive exclusionary ruling of the court no clue to any probative relevancy between the subject of inquiry and the issue involved"); Pressler, supra, comment on R. 1:7-3 (noting that "counsel who does not choose to make the proffer may be foreclosed on appeal from raising the question of the prejudicial effect of the exclusionary ruling unless the record or context of the excluded question clearly indicates or suggests what was expected to be proved by the excluded evidence"). Counsel's belated proffer of the proposed testimony at defendant's motion for a new trial more than three months after defendant testified, could not, of course, preserve defendant's alleged exculpatory testimony theoretically available but never proffered at the trial itself.
We also note that even if Imelda's purported statement had been properly proffered and improperly excluded at trial, the error would have been harmless, R. 2:10-2, as a substantial quantum of evidence was adduced suggesting that Imelda's death-causative injuries might have resulted if her pneumonia had caused her to fall down a flight of stairs, and the jury clearly rejected that theory. See Hunt, supra, 115 N.J. at 365-66, 558 A.2d 1259; Pratt, supra, 226 N.J.Super. at 322-23, 544 A.2d 392. We perceive no sound basis for intervention.
Affirmed.
NOTES
[1] As neither party raised the issue, we do not address whether defendant has standing to challenge the disallowance of Ejaz' claim of privilege on appeal. See N.J.R.E. 533(1) ("A party may predicate error on a ruling disallowing a claim of privilege only if he is the holder of the privilege."); State v. Shahamet, 228 N.J.Super. 340, 345-46, 549 A.2d 884 (App.Div.1988) (noting that even if his wife's Uniform Defendant Intake Report were privileged, defendant would not be entitled to a new trial based upon the erroneous use of her statement contained therein).
[2] Evid. R. 23(2)(a), the precursor to N.J.R.E. 501(2)(a), provided that "[t]he spouse of the accused in a criminal action shall not testify in such action except to prove the fact of marriage unless (a) such spouse and the accused shall both consent."
[3] Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (requiring separate trials where defendant's confession cannot be effectively redacted to avoid inculpating a co-defendant).
[4] N.J.R.E. 509 provides, in relevant part, that "[n]o person shall disclose any communication made in confidence between such person and his or her spouse unless both shall consent to the disclosure or unless the communication is relevant to an issue ... in a criminal action or proceeding in which either spouse consents to the disclosure, or ... coming within ... [N.J.R.E. 501(2)].