**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1132-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RASHAWN CARTER, a/k/a
CURTIS WALKER,

    Defendant-Appellant.

_____

Argued April 11, 2018 — Decided July 17, 2018

Before Judges Fuentes, Manahan and Suter.

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Indictment No.
11-12-2963.

David A. Gies, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public
Defender, attorney; David A. Gies, on the
briefs).

Linda A. Shashoua, Assistant Prosecutor,
argued the cause for respondent (Mary Eva
Colalillo, Camden County Prosecutor,
attorney; Linda A. Shashoua, of counsel and
on the brief).

PER CURIAM

Tried by a jury over nine days,[1] defendant Rashawn Carter was convicted in connection with an armed robbery of a bakery in which co-owner Oscar Hernandez (Hernandez) was murdered. Defendant was found guilty of first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); five counts of first-degree armed robbery, N.J.S.A. 2C:15-1 (counts three, four, six, seven and eight); five counts of third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (counts fifteen through nineteen); and conspiracy to commit armed robbery, criminal restraint and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:5-5, N.J.S.A. 2C:15-1, N.J.S.A. 2C:13-2(a) and N.J.S.A. 2C:39-4 (count twenty-three). The remaining charges were dismissed.

On September 21, 2015, having previously denied a motion for a new trial, the court imposed an aggregate 107-year term of incarceration subject to eighty-five percent parole ineligibility in accord with the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. More specifically, the court ordered that defendant first serve the sentence imposed on the murder charge (count two), which was merged with a robbery charge (count three), of fifty-five years' incarceration with eighty-five percent parole ineligibility

---

[1] William Cooper, co-defendant, was tried together with defendant. Cooper filed an appeal based upon his conviction and sentence. The merits of that appeal do not affect the instant appeal.

subject to NERA. The court then merged the remaining counts and ordered that defendant serve a consecutive sixteen-year term of incarceration with eighty-five percent parole ineligibility subject to NERA. Defendant appeals and we affirm.

We derive the following facts from the trial record. On October 14, 2009, at approximately 8:40 p.m., three men, later identified as defendant, co-defendant William C. Cooper, and Maurice Carter, defendant's brother, entered Alex's Bakery in Woodlynne. Present were Hernandez and Silvia Ramos Morales, husband and wife who owned the bakery, and patrons. Cooper was armed with a handgun, and wore a hooded sweatshirt with the hood pulled over his head, along with a black face mask that covered his entire face and gloves. Defendant wore a red "Ed Hardy" jacket, with no mask or gloves. Maurice[2] wore a black jacket with grey and white stripes. After the men entered the bakery, Cooper walked toward the cash-register and pointed the gun at Hernandez, who was standing behind the counter. Hernandez ran toward the bakery's kitchen and attempted to shut the kitchen door to block Cooper from entering. Cooper followed Hernandez, and after a struggle, was able to push open the door. Cooper then fatally shot Hernandez.

---

[2] We refer to defendant's brother by his first name to avoid confusion.

While this occurred, Maurice stood guard at the front door of the bakery while defendant ordered the other bakery patrons, Blanca and Anayeli Ramirez, and Felipe Lopez, to get on the ground. Cooper then gathered Blanca, Anayeli, and Felipe, and brought them into the kitchen, where he demanded they give him their money. Ramos Morales was able to stay hidden from defendant's view and pressed an alarm button. Defendant and Maurice attempted to open the cash register without success. When two individuals attempted to enter the bakery, defendant held the door closed and told them the bakery was closed. Before leaving the bakery, Cooper noticed Ramos Morales, who was still pressing the alarm button, and motioned her with his gun to go back into the kitchen. When someone yelled that the police were on their way, the men left.

That night, Sergeant Lance Saunders, a detective with the Camden County Prosecutor's Office (CCPO), interviewed Ramos Morales. She described the person who shot her husband as "tall, not a really short person but not that tall" and as taller than Saunders. She told Saunders that he was a "little bit heavier than the others" and that she could not see his face.

Latasha Baker, defendant's sister, was also interviewed as a witness and a victim of the robbery. Prior to the robbery, Baker entered the bakery with her then a one-year-old son, and attempted to buy a slice of cake. After Hernandez informed her that he was

4

unable to sell her a slice of cake, as the cake had to be sold whole, Baker walked around the bakery and left. Baker then returned with her son and again asked if Hernandez would sell her a slice of cake. Baker was inside the bakery when it was robbed. She alleged that her cell phone had been taken during the robbery, and provided the police with her cell phone number.

Saunders obtained a Communications Data Warrant to track Baker's allegedly stolen cell phone. John Husinger, a United States Marshal, was able to trace the cell phone to Baker's house using her cell phone number. Baker allowed the police to enter her home. Using a hand-held signal monitoring device, the cell phone was found underneath her couch. Baker was then re-interviewed. When asked how the allegedly stolen cell phone was in her house, she gave three different reasons. First, "that [defendants] probably knew she was a single mother with two kids[,] so they broke into her house and put the phone back." Second, "that [defendants] were trying to frame her." Third, "[defendants] probably put it back so she wouldn't tell on them."

Based on this information, Saunders reviewed Baker's cell phone records and discovered that on the date of the robbery, between 8 and 9 p.m., there were approximately thirteen calls between Baker's cell phone and defendant. All the calls were placed in the general area of the bakery and Baker's home.

Saunders then reviewed the security footage of the bakery from the night of the robbery. From that review, he observed Baker leaving the bakery for the first time and walking toward a back alley, which was the alley that defendants emerged from a few minutes later, prior to the robbery and shooting.

In the course of the investigation, Saunders spoke to Eddie Bell, the father of Baker's son. Saunders showed Bell a picture of the robbery suspects. Bell was able to recognize the red Ed Hardy jacket that defendant wore during the robbery as his own jacket. Saunders also showed Bell the surveillance footage of the bakery from the night of the robbery, and Bell was able to identify defendant. Saunders also spoke to Vernon Carter, defendant's brother. Vernon[3] told Saunders that his brother told him they were "supposed to . . . get the money and that's it" but that the "robbery went bad."[4]

A warrant was issued for defendant's arrest and executed at Baker's house by the U.S. Marshals Regional Fugitive Task Force.

---

[3]  We refer to defendant's brother by his first name to avoid confusion.

[4]  During the trial, Vernon, who was compelled to testify, recanted his statement.

Defendant and Cooper were found hiding in a pantry closet and arrested.[5]

Prior to trial, Maurice pled guilty to one count of armed robbery. Pursuant to the plea agreement, Maurice was sentenced to a ten-year term of incarceration subject to eighty-five percent parole ineligibility in accord with NERA.

During jury deliberations, the jury sent a note to the court stating, "[the] deliberation process [for juror five] is too stressful, and she is asking to be substituted with one of the alternate jurors." The same note also stated that "last night [j]uror [eleven] looked up info on [the] internet about facts on everything in [the] [manila] folder. Is this ok? Can info be shared to all jurors?"

The court brought out juror eleven into the courtroom to inquire if she had shared any information with the other jurors. Juror eleven stated that the manila folder contained her printed research that she found on the internet that morning. The research included: "Police Records" by the Reporters Committee for Freedom of the Press, Winter 2008; "How Reliable is Eyewitness Testimony" by the American Psychological Association, April 2006; and

---

[5]  At trial, a cellmate of Cooper's, Michael Streater, testified regarding an admission by Cooper of his participation in the robbery and his shooting of Hernandez. Defendant does not challenge that testimony or its admissibility on appeal.

"Exonerations in the United States, 1989 to 2012," by the National Registry of Exonerations, June 2012.  The court then asked whether she had told any other jurors that she had those materials.  The following colloquy occurred between the court and juror eleven:

> JUROR ELEVEN:  What I said was that I couldn't sleep last night and that I needed some — I needed to have a better understanding of certain things and that I went on the internet and I looked up two articles and a paper.  And — that I read them.  And that I printed them out — I didn't feel like I was violating my oath as a juror because I wasn't looking up the case but I read — you know, I felt like I had a better understanding of what my questions were.  But I felt like I needed to share that because — but I didn't share what I read or what I took from it.
>
> THE COURT:  First off, did you show any of the other jurors any of the written materials?
>
> JUROR ELEVEN:  No.  I told them what — I said what the names of the articles were.
>
> THE COURT:  Okay.
>
> JUROR ELEVEN:  That's what I said.  I just said like this article from this paper.
>
> THE COURT:  So did you — I mean did you tell them it was about articles about eyewitness identifications?
>
> JUROR ELEVEN:  Yes.
>
> THE COURT:  And exonerations.
>
> JUROR ELEVEN:  I said I had a question on eyewitness — eyewitness identifications and I also had questions on when things got overturned due to erroneous eyewitness

A-1132-15T1

identification. And I had questions on what could or could not be shared during an investigation by the press in the State of New Jersey and Pennsylvania.

THE COURT: All right. [W]as everybody within earshot when you were talking about this?

JUROR ELEVEN: Yes. I came in this morning and said I couldn't sleep last night. I had questions, you know, and this is what I — I looked up and I said the names of the articles. I said, you know, I feel like I need to tell you that I did this. I said I think I need to let you guys know that I did this. And I did — I said I'm not going to say what I read —

THE COURT: So did you disclose to any of the other jurors the content of what you read?

JUROR ELEVEN: No, not what I read — I told them the article's name but not that according to this article this is this or that is that, no. And I said, you know, I think this needs to get shared and if, you know, if it's okay to be shared then I think it's up to everybody else if they want to look at it or not.

. . . .

THE COURT: Did anybody say anything in response to the particular subjects that you were mentioning?

JUROR ELEVEN: No.

The court discharged juror eleven, without objection, and then called each juror individually to ask what juror eleven said to them about her research, and to determine if the jurors could remain impartial in their deliberations. After questioning each

juror, the court was satisfied that deliberations could continue. Again, no objection was raised.

The court also discharged juror five, without objection, who was approximately seven months pregnant. Juror five explained that the stress from the deliberation process was too much for her to handle, explaining "[m]y head was splitting and I was very anxious, I couldn't stop thinking about it. I woke up in the middle of the night, I was thinking, I couldn't go back to sleep. I'm a usually calm person and I couldn't even sleep." The court then selected two alternate jurors, without objection, and the judge instructed the jury to begin deliberations as a new jury.

After deliberating for two days, the jury sent a note stating, "[W]e are currently a hung jury and have not been able to reach a unanimous decision after days of deliberation. Where do we go from here?" However, before the court could respond, the jury sent another note, stating, "[W]e're trying a new strategy to reconsider our decision." Shortly thereafter, another note was sent stating, "Juror [fourteen] feels that juror [seven] has preconceived notions on the case. [Juror seven] said she knew the area and specific details on it. Also, she recalls reading the paper."

Based upon the note, juror fourteen was brought into the courtroom. The court asked juror fourteen, "how is it that you

are saying here that [juror seven] said she knew the area and specific details on it?" Juror fourteen explained:

> [W]e were looking at a piece of evidence and she made reference and said there's a gas station here, there's Mount Ephraim here, speaking of a street, counting how many houses it was to a certain person. Just there's a lot of things that to me didn't make sense.
>
> Like, obviously she said she's from Camden so she knew the area, but to me she knew specific streets and like things right next to the bakery. That to me was like if you know this you probably know the bakery is here.
>
> And also a couple of days ago she was speaking about how she most likely read the article about the incident . . . so she had prior knowledge to [sic] the incident.

The court then called juror seven, who explained the basis of her knowledge of the location.

> [W]hat was given to us, the big board, and my knowledge, which when we came up and asked the questions, I'm from the city, I'm familiar. So from looking on the board with the streets, something would indicate that it was a light. And I indicated what street the light was on. That was it, from my knowledge of the city and on the board from the street.

Juror seven also stated that she might have read a newspaper article when the murder happened because she lives in the same city, but it happened so long ago that she did not remember.

The following colloquy occurred between the court and juror seven:

11

THE COURT: Do you have any preconceived notions about the case?

JUROR SEVEN: I do not.

THE COURT: Okay. Does the fact that apparently at least as of this morning somebody else on the jury thought you did, would that impact your ability to continue to be fair and impartial as a juror?

JUROR SEVEN: No.

THE COURT: Would it impact your ability to interact with that juror or any of the other jurors as part of your deliberations?

JUROR SEVEN: Not at all.

The court then brought juror fourteen into the courtroom and asked whether he could continue to interact with juror seven and the other jurors effectively as part of his deliberations. Juror fourteen replied, "I'm just — I don't know. It's tough." The court called each juror individually to determine if the content of juror fourteen's note would impact their ability to be a fair and impartial juror. The court then addressed the jury as a whole, instructing:

I've concluded that there's nothing, no information to indicate that outside information has been improperly interjected into this case.

[E]ach of you must decide the case for yourself but do so only after an impartial consideration of evidence with your fellow jurors. . . . do not hesitate to reexamine your own views and change your opinion if

convinced it is erroneous but do not surrender your honest conviction as to the weight or the effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

After a lunch break, the court again called juror fourteen and asked whether, based on the instructions the court gave before lunch, he could deliberate with the other jurors. Juror fourteen replied, "I think my head would be clear, I'll be alright to deliberate."

The jurors continued deliberations without objection. That same day, the jury returned its unanimous verdict finding defendant not guilty of murder, conspiracy to commit murder, and the two possession of weapon offenses. The jury found defendant guilty of the remaining charges, including felony murder. The court polled the jury, and all members were in agreement with the verdict.

A day later, juror seven emailed the Camden jury mailbox requesting to send a note to the trial judge. Several days later, the court received a letter from juror seven, stating:

> This note is to inform you that I feel I was pressured to vote guilty. I left the court Tuesday night not knowing what happened.
>
> I was hit with [the] accusation because I was from the city in which the crime took place and may have heard about the crime [five years] ago that I was unfit to serve, although I wasn't the only one with doubt . . . [A] lot

A-1132-15T1

that went on during deliberation, but Tuesday was heated.

At one point I had to walk out [of] the room, and another moment I had to address juror [nine's] use of profanity. I asked that we have a moment of silen[ce] several times, to cool things down.

I went to [the] bathroom and came out to find they continued deliberating and came up with guilty for [m]urder bartering not guilty for murder to get guilty for another.

I was in shock in the courtroom hearing all the guilty. I didn't remember agreeing to all that, when I was on the fence the whole time giving in at the last hour under unbelievable accusations and pressure.

[I] felt like I was on trial, I was the only one asked if I knew the defendants although I wasn't the only one having a hard time placing them there. (Now I know how it feels to be innocent in a room of people [who] feel you are guilty)[.] . . . I felt myself defending myself although I was innocent.

. . . .

It wasn't right. I was on a [trial sometime] ago, and it was nothing like this. I was confident with my decision walking in on [November 18, 2014], and it changed an hour before it was all over. I would like to ask if any erased not guilty was on the paper, although I recalled some blanks that we [were] suppose[d] to go over. We started the [paperwork the] day prior, and never went back over [it].

Upon defendant's motion for a new trial, made prior to sentencing, the court held that the post-verdict note did not

require another voir dire of the excused jurors. The motion was denied.

On appeal, defendant raises the following arguments:

POINT I

THE TRIAL COURT'S DECISIONS TO REMOVE JURORS AFTER SUBMISSION OF THE CASE WAS AN ABUSE OF DISCRETION WHERE IT DID NOT BASE ITS DETERMINATION ON THE RULE OF LAW.

POINT II

THE TRIAL COURT'S DENIAL OF THE DEFENDANT'S NEW TRIAL REQUEST WAS ERRONEOUS WHERE THE DELIBERATION PROCESS EMPLOYED MAJORITARIAN BULLYING AND INTIMIDATION.

POINT III

THE MEANS USED BY THE STATE TO IDENTIFY THE DEFENDANT AS ONE OF THE THREE PERPETRATORS INSIDE THE STORE AT THE TIME OF THE ROBBERY WERE UNRELIABLE OR UNDULY PREJUDICIAL.

POINT IV

NOT ONLY WAS VERNON'S PRIOR STATEMENT UNRELIABLE BECAUSE IT WAS BASED ON AN UNDERSTANDING THAT HE WOULD RECEIVE A REWARD, BUT THE TRIAL COURT DID NOT DETERMINE ITS ADMISSIBILITY UNDER THE APPROPRIATE BURDEN OF PROOF.

POINT V

THE JURY'S VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE WHERE, TOGETHER WITH THE UNRELIABLE IDENTIFICATION TESTIMONY, THE FORENSIC EVIDENCE, WHICH WAS MINIMAL, DID NOT PLACE THE DEFENDANT AT THE SCENE OF THE CRIME.

15

POINT VI

WHERE THE PROSECUTOR REPEATEDLY ATTEMPTED TO IMPROPERLY ELICIT INFORMATION, WHETHER INTENTIONAL OR NOT, THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS UNDULY PREJUDICED.

POINT VII

THE DEFENDANT'S SENTENCE IS EXCESSIVE AND DISPROPORTIONATE TO THE SENTENCE IMPOSED ON MAURICE WHERE, CONTRARY TO THE TRIAL COURT'S FINDING, THE BROTHER'S ROLE IN THE ROBBERY AND MURDER WAS SUBSTANTIALLY SIMILAR.

I.

Defendant argues that the trial court abused its discretion by discharging two jurors. In opposition, the State invokes the invited-error doctrine, and argues that defendant should be barred from appealing the jurors' dismissal, because he did not raise this issue below and did not object when these jurors were discharged. The State also argues that defendant did not object to the retention of juror fourteen. Further, the State argues that although defendant waived this argument for purpose of appeal, the trial court's discharge of the jurors was proper.

Mistakes at trial are subject to the invited-error doctrine. State v. A.R., 213 N.J. 542, 561 (2013). Under that doctrine, trial errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal . . . ." State v. Corsaro, 107 N.J. 339, 345

(1987) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)). If a party has "invited" the error, he is barred from raising an objection for the first time on appeal. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010).

We are satisfied that "this case presents no fundamental injustice that would warrant relaxing the invited error doctrine." M.C. III, 201 N.J. at 342. Here, defendant's counsel did not object when the trial court discharged juror five and juror eleven, and when the court did not discharge juror fourteen. The acquiescence of defendant to the discharge and non-discharge of the jurors, in our view, constituted invited error.

Even if the invited-error doctrine does not apply, we conclude the court properly exercised its discretion in dismissing both juror five and juror eleven. This court's "review of a trial court's decision to remove and substitute a deliberating juror because of an 'inability to continue,' pursuant to Rule 1:8-2(d)(1), is deferential. [A reviewing court] will not reverse a conviction [on that basis] unless the court has abused its discretion." State v. Musa, 222 N.J. 554, 564-65 (2015). Further, claimed errors, to which no objection was made at trial, warrant reversal only if "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2.

Rule 1:8-2(d)(1) provides that after a jury begins deliberations, a juror may not be discharged and an alternate juror substituted unless "a juror dies or is discharged by the court because of illness or other inability to continue . . . ." R. 1:8-2(d)(1). A juror may be discharged for "personal reasons unrelated to the case," and not from his or her interactions with other jurors. State v. Ross, 218 N.J. 130, 147 (2014). Physical illness or a juror's psychological condition are reasons that a juror may be discharged. Id. at 147-48; see also State v. Williams, 171 N.J. 151, 164 (2002) (explaining that "'inability-to-continue' has been invoked to remove a juror under circumstances that reveal that the juror's emotional condition renders him or her unable to render a fair verdict.").

Juror five was discharged after she informed the court that the stress from the deliberation process was too much for her to handle given she was approximately seven months pregnant at the time. She complained of feeling "very anxious," having a splitting headache, and being unable to sleep at night. She also explained that the stress had "nothing to do with the positions that people [were] taking." Since the discharge of juror five was not based on the deliberation, but based on reasons personal to her, the court did not abuse its discretion in her discharge. Musa, 222 N.J. at 567.

A trial court may remove a juror who has "expressed refusal to abide by her sworn oath to follow the law," State v. Jenkins, 182 N.J. 112, 130 (2004), and "disregard[s] the court's unambiguous admonitions" against speaking with individuals not on the jury who may influence them. State v. Holloway, 288 N.J. Super. 390, 404 (App. Div. 1996). "[I]f during the course of the trial it becomes apparent that a juror may have been exposed to extraneous information, the trial court must act swiftly to overcome any potential bias and to expose factors impinging on the juror's impartiality." State v. R.D., 169 N.J. 551, 557-58 (2001) (citing State v. Bey, 112 N.J. 45, 83-84 (1988)).

The jury was specifically instructed to "follow the law as . . . instructed by [the trial court]," and that "[a]nything less would be a violation of your oath or affirmation as jurors." As part of the jury charge, the court discussed in great length eye witness identifications and their reliability, and instructed the jury on specific factors they could consider in determining whether the identification should be afforded weight.

Juror eleven admitted to conducting outside research on the reliability of eyewitness testimony and exonerations in the United States. Accordingly, the court properly dismissed her for violating her oath as a juror for conducting outside research.

Defendant also argues that it was error to deny the motion for a new trial based upon "bullying" by a juror and the resultant corruption of the jury. For the reasons stated above, we find no merit to this argument.

Rule 3:20-1 provides that a trial court may not set aside a jury's verdict and order a new trial "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Similarly, a trial court's ruling on a defendant's new trial motion "shall not be reversed unless it clearly appears there was a miscarriage of justice under the law." State v. Sims, 65 N.J. 359, 373-74 (1974); R. 2:10-1. "The 'semantic' difference between 'miscarriage of justice' and 'manifest denial of justice under the law' is an 'oversight and should not be construed as providing for a different standard in criminal cases at the trial level than that applicable to appellate review . . . .'" State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 3:20-1 (2016)). The Supreme Court has "explained that a 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious

overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521-22 (2011)).

The decision whether to grant or deny a motion for a new trial is left to the trial judge's sound discretion, and this court should interfere with the exercise of that discretion only when "a clear abuse has been shown." State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)).

During deliberations, juror fourteen expressed concern that he felt "held hostage, like it's this way or it's not" by juror seven's "preconceived notions on the case." However, juror fourteen, upon questioning by the court, later clarified that he was no longer concerned about juror seven's preconceived notions as it may have been based on "a piece of evidence, one of the articles that was in evidence." Again, defendant did not object to retaining juror fourteen.

Defendant also takes issue that the court decided to continue with the deliberations after juror substitution and to not declare a mistrial.

The trial court's specialized "feel of the case" extends to assessing whether the timing of the removal made it unwise to

substitute a juror. Generally, the determinative factors of this assessment include: (1) the length of time the jury deliberates, and (2) the progress in deliberations that will bear on the reconstituted jury's ability realistically to begin deliberations anew. Jenkins, 182 N.J. at 132. When the "'deliberative process has progressed for such a length of time . . . that it is strongly inferable that the jury has made actual fact-findings or reached determinations of guilt or innocence,' there is a concern that the new juror will not play a meaningful role in deliberations." Ibid. (quoting Corsaro, 107 N.J. at 352).

Our Supreme Court has not recognized the duration of deliberation as a bright line indication that a jury is incapable of beginning anew. See Ross, 218 N.J. at 154-55. Instead, our courts have sometimes compared the length of deliberations before and after the substitution as part of "the totality of the circumstances." State v. Williams, 377 N.J. Super. 130, 150 (App. Div. 2005).

It has been recognized that, rather than cause a rift in deliberations, alternate jurors are likely to function as effectively as if they had been present from the beginning and may also be able to reconcile solidifying and divergent positions of other jurors. See Holloway, 288 N.J. Super. at 405.

Here, the substitution occurred merely three hours into deliberations, following approximately thirteen hours of testimony over five trial days, with myriad videos, photos, and items of evidence to review and debate. Based upon the totality of the circumstances, we discern no factual or legal basis for error in the substitution of jurors.

Nor do we discern error in the denial of the motion for a new trial predicated upon the post-verdict note from juror seven. We agree with the court that the issues raised in the note were "no more than the discomfort produced by deliberative pressures . . . ." State v. Williams, 213 N.J. Super. 30, 35 (App. Div. 1986).

### III.

Defendant also argues, for the first time on appeal, that the trial court's evidentiary rulings were improper. Specifically, defendant raises the following issues: (1) Bautistas' out-of-court identification is improper due to impermissible suggestive questioning; (2) Bell's out-of-court identification is unreliable; and (3) the Historical Cellular Site Analysis is unreliable. Since we give substantial deference to a trial court's evidentiary rulings, they should be upheld absent a showing of an abuse of discretion. State v. Weaver, 219 N.J. 131, 149 (2014).

First, defendant claims Bautistas' identification of defendant was the result of impermissibly suggestive questioning by the police. When the admissibility of out-of-court identification is questioned due to impermissibly suggestive questioning, New Jersey uses the following two-step analysis: (1) whether the identification used by the police was impermissibly suggestive, and if so, (2) whether that procedure was nevertheless reliable by considering the totality of the circumstances and "weighing the suggestive nature of the identification against the reliability of the identification." State v. Romero, 191 N.J. 59, 76-77 (2007) (quoting State v. Herrera, 187 N.J. 493, 503-04 (2006)); see also United States v. Wade, 388 U.S. 218 (1967).[6]

Here, the court denied defendant's motion for a Wade hearing pre-trial, as defendant failed to meet the burden of demonstrating the existence of suggestive police procedures. Based upon our review of the record relating to the out-of-court identification, we discern no error.

Defendant also argues that the court improperly rejected defendant's challenge regarding Bell's identification of defendant based on the surveillance video. The court found Bell's

---

[6] The eyewitness identification standards our Supreme Court adopted in State v. Henderson, 208 N.J. 208, 302 (2011) do not apply here because these crimes occurred on October 14, 2009.

identification was not lay opinion testimony, but rather a statement of fact. Lay witnesses may properly offer interpretations of a video recording so long as those interpretations are based on personal knowledge and will be helpful to the jury. See State v. Loftin, 287 N.J. Super. 76, 100 (App. Div. 1996).

In Loftin, we held that the personal knowledge of the detective that allowed him to narrate the videotape was properly based on "his own perception of defendant's actions as seen on the videotape." Id. at 100. Similarly, someone who can demonstrate familiarity may be permitted to testify regarding identification. See State v. Carbone, 180 N.J. Super. 95 (Law Div. 1981). In Carbone, the State was permitted to admit lay witness testimony of personal photographic identifications of the defendant before the jury in an armed robbery prosecution, by persons who were not witnesses to the crime, but had personal knowledge of and familiarity with the defendant's appearance at the time of the commission of the offense charged where the defendant's appearance had changed since that time. Id. at 96-97, 100.

Here, Bell was familiar with defendant's appearance, having known him personally for about six years. Bell also identified defendant by the distinctive jacket defendant wore during the robbery and later found at Baker's house. The court found, and

25

the record supports, that Bell's statement was rationally based on his perception and thus admissible.

Defendant also argues that the Historical Cell Site Analysis is unreliable. This argument is wholly unsupported. Aside from bald assertions, defendant points to no authority that would undermine the reliability of this evidence.

As the court noted, and we agree, defendant's challenges regarding the methodology of his identification were addressed before the jury during the cross-examination of the State's witnesses and also addressed during summation. Presumably, the jury considered those challenges in reaching the verdict.

IV.

Defendant further argues that Vernon's statements were unreliable because he was expecting a reward in exchange for the testimony and that the statements did not satisfy the burden of proof for admissibility. We disagree.

We first address the prior statement argument. A prior statement of a witness is not excluded by the hearsay rule if the statement "is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with <u>Rule</u> 613." N.J.R.E. 803(a)(1). In <u>State v. Bryant</u>, we held that inconsistent testimony was not restricted to "diametrically opposed answers but may be found in evasive answers, inability to recall, silence or

changes in position." 217 N.J. Super. 72, 75 (App. Div. 1987) (quoting United States v. Dennis, 625 F.2d 782, 795 (8th Cir. 1980)).

In accordance with N.J.R.E. 803(a)(1), when a prior statement is being offered by the party who called the witness, the statement must not only be inconsistent, but is also subject to the additional requirements that it "(A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing it reliability or (B) was given under oath subject to the penalty of perjury at trial or other judicial . . . proceeding . . . ." See State v. Baluch, 341 N.J. Super. 141, 178-79 (App. Div. 2001).

In Baluch, we noted that when an "out-of-court written or recorded statement [is] sought to be admitted under N.J.R.E. 803(a)(1)(A)," the trial court must determine whether the statement was made under circumstances establishing sufficient reliability. Baluch, 341 N.J. Super. at 179. The reliability factors to be considered in this evaluation were set forth in State v. Gross, 121 N.J. 1, 10 (1990). Moreover, "the standard for determining reliability is one that invokes all surrounding circumstances." State v. Spruell, 121 N.J. 32, 42 (1990).

In Gross, our Supreme Court held that the reliability of the statement must be established by a fair preponderance of the

evidence prior to admitting the statement per N.J.R.E. 803(a)(1)(A). 121 N.J. at 15-16. The Court held that the following fifteen factors should be considered to determine if a statement is reliable:

> (1) The declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.
>
> [Id. at 10 (quoting State v. Gross, 216 N.J. Super. 98, 109-10 (App. Div. 1987)).]

Specifically, with respect to factor fifteen, it has been recognized that the corroboration requirement cannot be overly exacting. See Bryant, 217 N.J. Super. at 75.

28

During the investigation, police reached out to Vernon who provided a taped statement about a conversation he had with defendant. Vernon stated that a few days after the robbery, defendant told him about a "[r]obbery [that] went bad." Vernon said he initially thought defendant was joking, because defendant was "playing around and laughing and stuff, so I thought he was playing."

Vernon's appearance at trial was compelled by a material witness warrant after Vernon refused to sign a subpoena to appear in court. In his trial testimony, Vernon denied talking to defendant about any crime, and claimed that he did not remember talking to the sergeant at the prosecutor's office. Vernon claimed that he was never served with a subpoena, although he testified about his refusal to sign the subpoena.

After finding that Vernon was feigning his inability to recall his prior inconsistent statement regarding his conversation with defendant about the crime, the court conducted a <u>Gross</u> hearing to determine the reliability of Vernon's prior recorded statement by hearing from the detective who took the statement and listening to the un-redacted audio. Applying the <u>Gross</u> factors, the court concluded the statement to be reliable and found: (1) Vernon had an interest in the matter as his brother was one of the alleged perpetrators and he was involved in helping the marshals locate

29

defendants; (2) the statement was made to law enforcement while Vernon was not in custody or handcuffed, and principally in front of one detective; (3) the location was in an unsecured conference room at the prosecutor's office and Vernon was free to leave.

Regarding factor seven, whether Vernon incriminated himself or sought to exculpate himself by his statement, the court noted that Vernon was not even a target. The court found the physical and mental condition of Vernon to have been sound, finding that he was not under the influence or in any kind of discomfort.

Regarding factor ten, the trial judge found that the recording contained the entirety of the statement.

Regarding factor eleven, the court found no motive to fabricate from the statement itself, and no express or implied pressure by the interrogator. The court noted that while Vernon seemed "confused, arguably kind of convinced that something was in it for him" in return for turning in co-defendant Cooper, he was not in the same state of mind regarding turning in defendant.

The court stated:

> I do not see any evidence here that [Vernon] was under any belief that he was going to be paid or otherwise treated favorably for talking to [Saunders] and answering questions about what his brother allegedly told him in a telephone call.

The court also noted that there was no legal requirement to tell Vernon about the anticipated use of the statement and that Vernon's statement was "much more inherently believable rather than unbelievable." Accordingly, the court found Vernon's prior recorded inconsistent statement to be admissible.

The record supports the court's factual and credibility findings and legal conclusion. While the court did not reference the preponderance burden expressly, it was clear from the context that the court was fully aware that it was the State's burden. The court referenced the <u>Gross</u> standard and each factor individually in his comprehensive oral ruling. In sum, we discern no error in the evidentiary rulings relating to Vernon's testimony.

V.

Defendant further argues that the jury's verdict was against the weight of the evidence. Specifically, defendant argues there was a lack of forensic evidence and lack of reliability on the part of the State's witnesses.

A trial court's denial of a defendant's motion may not be reversed on appeal unless "it clearly appears that there was a miscarriage of justice under the law." <u>R.</u> 2:10-1; <u>Sims</u>, 65 N.J. at 373-74.

It is well-established that a trial court may not "set aside the verdict of the jury as against the weight of the evidence

unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law."  R. 3:20-1.

It is well-settled law that "a reviewing court should not overturn the findings of a jury merely because the court might have found otherwise if faced with the same evidence."  State v. Afanador, 134 N.J. 162, 178 (1993).  "Unless no reasonable jury could have reached such a verdict, a reviewing court must respect a jury's determination."  Ibid.  The objective in such a review "is not to second-guess the jury" in its assessment of the witnesses' credibility, "but to correct the injustice that would result from an obvious jury error."  State v. Saunders, 302 N.J. Super 509, 524 (App. Div. 1997) (citing State v. Balles, 47 N.J. 331, 337 (1967)).

Given the totality of the evidence and reasonable inferences that the jury could have drawn from the evidence, we conclude that defendant's lack of forensic evidence argument lacks merit.

As well, defendant's argument that the testimony of Vernon and Bell was "unreliable" similarly lacks merit.  We add only that the court found that "[t]he contents of Vernon Carter's statement would have been sufficient to justify the jury's guilty verdicts against Carter even had the State presented no other evidence

against Carter," recognizing that Vernon's statement included a confession by defendant which was corroborated by the surveillance video and enhanced by the accuracy of Vernon's information which led police to the defendants. In regard to Bell's testimony, the court found that the statement that Bell recognized the person he had known for six years pictured in the video wearing what appeared to be his red-hooded jacket as defendant was a "powerful evidence that by itself would have justified the jury's verdicts against [defendant]." These findings are supported in the trial record and were not erroneous.

## VI.

Defendant also argues that prosecutorial misconduct denied him a fair trial. Specifically, defendant argues that the State asked irrelevant questions to Michael Streater; the State improperly referred to Baker as "defendant's sister"; and the court's instructions did not cure the taint caused by Saunders' misidentification.

Whether a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are "peculiarly within the competence of the trial court," who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting. State v. Yough, 208

N.J 385, 397 (2011) (quoting <u>State v. Winter</u>, 96 N.J. 640, 646-47 (1984)).

"For that reason, an appellate court should not reverse a trial court's denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" <u>Yough</u>, 208 N.J. at 397 (quoting <u>State v. LaBrutto</u>, 114 N.J. 187, 207 (1989)). The granting of a mistrial is an extraordinary remedy to be exercised only when necessary "to prevent an obvious failure of justice." <u>State v. Harvey</u>, 151 N.J. 117, 205 (1997).

During cross-examination, Cooper's counsel repeatedly asked Streater about a portion of his police interview where Streater told Saunders that he knew a person who worked at City Select Auto who, as Cooper's counsel put it, was "the only black guy" that worked there. However, Streater tried to clarify that the conversation was not about cars. On redirect, the prosecutor allowed Streater to clarify:

> Q: Now, counsel was asking you a bunch of questions about autos and City Select Auto and you said when you were having that conversation with Sergeant Saunders it wasn't about cars, it was about trying to pinpoint someone.
>
> A: Yes.

Q: Right. Okay. What was it you were trying to explain to Sergeant Saunders that led to you talking about somebody at City Select?

A: I was explaining that the guy — it was a black guy that used to work there.

Q: Okay.

A: He was the only black guy, I think, at that time that I was describing him as like a goofy guy.

Q: Okay. What relevance did that guy have to the case you were talking about, to William Cooper?

A: Supposedly had a baby by the female, the house that they planned the stuff in.

Q: Okay. So . . . what William Cooper told you about, him having a baby with this woman where they planned the crime?

A: Yes.

On re-cross-examination, Cooper's counsel again asked: "Mr. Streater, with respect to the guy that was at City Select, isn't what Mr. Cooper told you was that his girlfriend had a sister who had a baby with that guy?" Streater replied, "Something like that." When the prosecutor attempted to follow up by asking, "But what was the relevance of his girlfriend's sister to the case?", there was an objection. Streater did not get to respond before the trial judge advised counsel to move on.

In denying defendant's motion for a new trial regarding this exchange, the court pointed out that defendant still had not

identified how this exchange prejudiced him and concluded that "this line of questioning was so tangential and confusing that the jury could not have concluded that this opaque [trial] somehow led to [defendant]." The court properly found that such a fleeting exchange was rightfully short of constituting a prosecutorial error, much less a manifest injustice.

Regarding whether the State's designation of Baker as "defendant's sister" during the questioning of FBI Agent William Shute about the crimes was proper, the court properly found that the reference to Baker as a "defendant" was isolated and did not constitute misconduct.[7]

Regarding Saunders' testimony identifying the persons in the picture as "defendants" rather than as "suspects," there was no objection. Notably, it was the court that raised the concern, not defense counsel.

On cross-examination, co-defendant's counsel inquired of Saunders:

> Q: I guess my question is in that snapshot of the video there are people in the video, correct?
>
> A: Yes.

---

[7] Shute provided expert testimony and applied a technique known as historical cellular site analysis to opine that during the minutes before the robbery, defendant's cell phone was within one-half to seven-tenths of a mile from Bakers's cell phone.

Q: Is that who you were referring to as the defendants?

A: Yes, that's correct.

Q: Can you see the people who are in that picture?

A: Yes.

Q: Well, can you see facially who those people are?

A: No.

Q: I guess my question is when you said the area that the defendants were in, did you mean where the suspects came from?

A: Well, they're defendants, so. You mean — I'm not too —

Q: I guess my question is are you making an identification saying that these people are these defendants or are you saying —

A: Oh, yeah, I know who they are.

The court gave a curative instruction relative to the use of the word "defendants." We give great deference to the trial court's determination when reviewing the effectiveness of curative instructions. Winter, 96 N.J. at 646-47. In the exercise of that deference, we discern no error.

VII.

Finally, we turn to defendant's arguments relating to the sentence. It is well-recognized that "[a]ppellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109,

37

127 (2011). "[A]dherence to the Code's sentencing scheme triggers limited appellate review." State v. Cassady, 198 N.J. 165, 180 (2009). More specifically, "[a]n appellate court is not to substitute its assessment of aggravating and mitigating factors for that of the trial court." State v. Bieniek, 200 N.J. 601, 608 (2010) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). At sentencing, the court adhered to the sentencing guidelines and stated reasons for imposing the sentence.

On defendant's felony murder conviction, the court imposed a fifty-five-year NERA term; after merging defendant's count three robbery conviction into count two, and similarly merging the criminal restraint counts, the court imposed consecutive sixteen-year NERA terms on the remaining robbery charges under counts four, six, seven and eight.

The court then considered the applicable aggravating and mitigating factors. The court found aggravating factors one, three, six and nine pursuant to N.J.S.A. 2C:44-1(a).

The record amply supports the court's detailed findings of each of the aggravating factors, which justifies the imposed sentence. O'Donnell, 117 N.J. at 215-17. Concerning the court's application of aggravating factor one, that factor was only applied to the armed robbery offenses. The court found that, "It was especially cruel and completely unnecessary for the defendant to

force the other victims and to stay in the store after the shooting and to actively participate in herding them into the kitchen where Hernandez lay dying."

Our Supreme Court recently noted that when applying factor one, "the sentencing court reviews the severity of the defendant's crime, 'the single most important factor in the sentencing process,' assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public." State v. Fuentes, 217 N.J. 57, 74 (2014) (quoting State v. Lawless, 214 N.J. 594, 609 (2013)). "[A] sentencing court may justify the application of aggravating factor one . . . by reference to the extraordinary brutality involved in an offense." Id. at 75. "A sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Ibid. (alteration in original) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010)).

Here, the court's basis for applying this factor was premised upon detailed findings regarding the heinous nature of defendant's conduct. Those findings fully support the court's conclusion that aggravating factor one applied.

As well, we find no basis for error in the court's rejection of mitigating factor two. In rejection of that mitigating factor, the court reasoned:

> In finding the defendant liable as an accomplice, the jury necessarily concluded that the defendant knew beforehand that at least one of the perpetrators would be armed and that the defendant acted with the purpose to facilitate armed robberies that involved either the use of force or the threat of force. Thus, it cannot be said that the defendant did not contemplate that his conduct would cause or threaten serious harm to anyone.

We next address the court's imposition of consecutive sentences. Consecutive sentences do not constitute an abuse of discretion when separate crimes involve separate victims, separate acts of violence, or separate times and places. State v. Carey, 168 N.J. 413, 422-23 (2002).

Furthermore, under our sentencing scheme, there is no presumption in favor of concurrent sentences, and the common law guidelines that there should be "no free crimes" tilts a court in the direction of consecutive sentences. Id. at 423; State v. Yarbough, 100 N.J. 627, 630 (1985).

The Yarbough guidelines direct a court to focus on the facts relating to the crimes, concentrating on such considerations as the nature and number of offenses for which the defendant is being sentenced, whether the offenses occurred at different times or places, and whether they involved separate victims. Carey, 168 N.J. at 423.

Moreover, "[t]he total impact of singular offenses against different victims will generally exceed the total impact on a single individual who is victimized multiple times[,]" and thus, "defendant's culpability exceeds the culpability of someone who commits the same group of offenses against a single victim . . . ." Carey, 168 N.J. at 429.

In this case, the court imposed consecutive terms for the robberies. The court found:

> As to the crimes against bakery co-owners Oscar Hernandez and Silvia Ramos Morales, meaning the felony murder of Oscar Hernandez under [c]ount [t]wo and the armed robbery of Silvia Ramos Morales under [c]ount [f]our, the objectives of those crimes were not predominantly independent of each other. On the other hand, the crimes against the other victims and the objectives of those crimes were predominantly independent of the objectives of the felony murder and the armed robbery of the bakery. The armed robbery and criminal restraint of the other victims were committed in a desperate ad hoc attempt to salvage some proceeds from the attempted theft of the bakery that had yielded no proceeds after the defendant and the other perpetrators were unable to open the bakery's cash register. It is reasonable to conclude from the evidence in this case that the defendant's objective in storming into the bakery with his accomplices was not to restrain and rob the other victims, but to rob the bakery. Thus, this factor supports imposition of concurrent sentences for the crimes against Oscar Hernandez and Silvia Ramos Morales and consecutive sentences for the crimes against the other victims.

The court continued:

> The second . . . fourth, and fifth
> Yarbough factors also support imposition of
> consecutive sentences for the crimes against
> the other victims. The armed robberies under
> [c]ounts [s]ix, [s]even, and [e]ight involved
> separate acts of violence or threats of
> violence from the violence used in the felony
> murder and the robbery of the bakery, and the
> criminal restraint of the victim who was not
> robbed created a substantial risk of injury
> separate from that created by the felony
> murder and the armed robbery of the bakery.
> Also, those other armed robberies and the
> criminal restraint involved multiple victims.
> Further, the convictions for which sentences
> are to be imposed are numerous.

The court found that factor three supported the imposition of concurrent sentences, as all the crimes were committed close in time and in the same place. Thus, in weighing the Yarbough factors on a qualitative and quantitative basis, the court found that the sentences for the offenses under counts two and four would be concurrent, while the sentences involving the other victims would be consecutive.

Considering the numerous crimes defendant committed, the punishment was proper. Carey, 168 N.J. at 423. By not imposing a consecutive term, it would have resulted in giving defendant multiple "free" crimes. Defendant's consecutive term for these separate crimes, perpetrated on these separate victims, does not

42

shock the judicial conscience.  See State v. Spivey, 179 N.J. 229, 245 (2004).

Finally, we address the disparate sentence argument.  When a comparison of co-defendant's sentences reveals "grievous inequities," the greater sentence may be deemed excessive.  State v. Roach, 167 N.J. 565, 570 (2001) (Roach II).  This court's review of an allegation of sentencing disparity is quite limited, and not different from a case in which a defendant maintains that the sentence imposed was excessive.  See State v. Tango, 287 N.J. Super.  416, 422 (App. Div. 1996).  We have also recognized that, where the defendants' backgrounds, roles in the crime, and cooperation with prosecution differed widely, their sentences may differ widely.  State v. Williams, 317 N.J. Super. 149, 159 (App. Div. 1998).

The court, in rejection of defendant's argument found:

> First and foremost, [Maurice] is not substantially similar to the defendant regarding all relevant sentencing criteria. Most significantly, [Maurice] was convicted following a guilty plea to a single offense involving a single victim, the armed robbery of Silvia Ramos Morales. As part of his plea, [Maurice] implicated [Carter] as well as the other co-defendant, William Cooper. By contrast, [Carter] was found guilty not only of the same offense as that to which [Maurice] pleaded guilty, the armed robbery of Ms. Ramos Morales, but also a felony murder as to Oscar Hernandez, armed robbery as to Mr. Hernandez,

43

armed robbery as to three other victims, and criminal restraint of multiple victims.

Moreover, the defense['s] argument that the nature and extent of the role of [Maurice] and [Carter] in this case were substantially similar is unpersuasive. The record in this case includes cell phone records and expert testimony showing that during the hours and even minutes leading up to the robbery, the defendant was the person who was in frequent communication with his sister, La[t]asha Baker, who acted as lookout inside the bakery and later falsely played the role of victim. Thus, there is reason to conclude that the defendant was far more involved with the planning of the robbery than was [Maurice].

As to the second Roach factor, the basis for the sentence imposed on [Maurice], . . . resulted from a plea agreement that the sentencing court found to be fair and reasonable. . . . Also, the State's choice to make a plea offer to [Maurice] and the details of that offer, and [Maurice]'s acceptance of that offer, including the requirement that he implicate the other defendants, are matters that are not relevant to the disparity analysis.

As to the third Roach factor, as noted, [Maurice] was sentenced to a [ten]-year [NERA] sentence for a single count of armed robbery. In conclusion, the sentence imposed on [Maurice] is not entitled to any weight in determining . . . this defendant's sentence since [Maurice] is not substantially similar to [Carter] as to any relevant sentencing criteria.

Accordingly, we are satisfied that disparate sentences were each factually and legally supported. There was no clear error of judgment and no misapplication of the sentencing guidelines so

44

as to "shock[] the judicial conscience."  <u>State v. Roth</u>, 95 N.J. 334, 364 (1984).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION